**WEST TEXAS GATHERING COMPANY, Cabot Corporation, Mesa Limited Partnership, and Mesa Operating Limited Partnership, Appellants,**

v.

**EXXON CORPORATION, Appellee.**

No. 08–91–00176–CV.

Court of Appeals of Texas,
El Paso.

Aug. 19, 1992.

Rehearing Overruled Sept. 30, 1992.

Jody Sheets, Culton Morgan Britain & White, Amarillo, Donald M. Hunt, Carr, Fouts, Hunt, Craig, Terrill & Wolfe, Lubbock, Michael H. Collins, James A. Fisher, Locke Purnell Rain Harrell, Dallas, Barry Bishop, Clark, Thomas, Winteres & Newton, Austin, for appellants.

Shannon H. Ratliff, Jack Balagia, Jr., McGinnis, Lochridge & Kilgore, Austin, Robert Scogin, Kermit, for appellee.

Before WOODARD, KOEHLER and BARAJAS, JJ.

## OPINION

KOEHLER, Justice.

In a suit brought by the gas producer against the purchaser and its guarantor for breach of the "take-or-pay" provisions of two natural gas sales contracts, the jury found that the purchaser had failed to purchase and receive from the producer the minimum quantities of gas which the jury interpreted to be required by terms of the contracts for the years of 1983 through 1988. From a judgment entered on the verdict awarding approximately $27 million against the purchaser and approximately $2.7 million against the guarantor, the respective parties bring this appeal. We reverse and render.

The parties to this contractual dispute are the Appellee, Exxon Corporation ("Exxon"), the producer which entered into several "take-or-pay"[1] natural gas purchase contracts with one of the Appellants, West Texas Gathering Company ("WTG"), the purchaser. WTG would buy or take nearly all of Exxon's gas[2] along with the gas from other producers in the Emperor Field

located in Winkler County and then sell all of such gas to El Paso Natural Gas Company ("EPNG"). The basis of Exxon's claim was WTG's alleged failure to "take-or-pay" for contractual quantities of gas in accordance with the provisions of the contracts. Cabot Corporation, another Appellant, is the parent company of WTG, having acquired all of WTG's stock from Pioneer Corporation in 1984. The claim against Cabot is based on the fact that in the acquisition, it assumed all of WTG's liabilities. Mesa Limited Partnership and Mesa Operating Limited Partnership (collectively "Mesa") were sued in their alleged capacity as guarantor of WTG's performance under the contracts. Exxon claims that when Mesa purchased the remaining assets of Pioneer Corporation in 1986 and generally assumed Pioneer's obligations and liabilities, it became liable on Pioneer's guaranty.

## FACTUAL BACKGROUND

In this appeal, we are concerned with two gas purchase agreements,[3] covering different leases, which have virtually identical take-or-pay provisions[4] and which re-

---

1. For a proper understanding of this case, it is advisable that we define a number of the terms which have a definite and well-understood meaning in the oil and gas industry but which may not be understood by persons unfamiliar with terminology of that industry. A "take-or-pay contract" is an agreement with a provision that requires a buyer of natural gas to take, or failing to take, to pay for a certain minimum quantity of gas which the producer has available during each year of the contract. "Take-or-pay deficiency" is the extent by which the buyer's purchases fail to meet the minimum annual contract quantity of gas. "Deliverability" is the combined delivery capacity of the wells in a particular field, in this case, the Emperor Field. A "nomination" is an estimate or prediction made by the purchaser and filed monthly with the Texas Railroad Commission ("TRC") informing TRC of the amount of gas it intends to take from the field in a particular month. An "allowable" is the volume of gas permitted by the TRC to be produced from a well or a field for the following month. The TRC sets the monthly allowable for a field or reservoir based in part on the nominations submitted and various other factors. Tex.Nat.Res.Code Ann. §§ 86.084–86.-089 (Vernon 1978 and Supp.1992). The allowable may not exceed the volume of gas which the TRC has determined to be the lawful market demand or the volume that can be produced from the field without waste, whichever is the

smaller quantity. 16 Tex.Admin.Code Ann. § 3.31 (1988). The field monthly allowable is then allocated among all gas producing wells in the field to give each well its fair share of the total production. Tex.Nat.Res.Code Ann. § 86.-087. A first purchaser is prohibited from discriminating between different wells in the same field. 16 Tex.Admin.Code Ann. § 3.34.

2. A minimal amount of gas was used in the production or transmission processes or otherwise lost.

3. Exxon filed suit on three gas purchase agreements, but went to the jury on only two of these, Contract Nos. 3530 and 3538. Claims under the third contract, number 3534, were apparently dropped before submission to the jury and were disposed of by the judgment which recited that "[a]ny and all pending claims for relief not expressly granted herein are denied."

4. The edited take-or-pay paragraphs of the gas purchase agreements relevant to this appeal are as follows:

ARTICLE IV
*Quantities*
Section 1. [D]uring the term hereof, Seller shall sell and deliver to Buyer, and Buyer shall purchase and receive from Seller and pay for,

placed expiring agreements between the same parties or their predecessors. The first of these is Contract No. 3530 which was entered into by WTG and Exxon on October 10, 1977, effective January 1, 1978. The second is Contract No. 3538, entered into by the same parties on December 15, 1977, effective January 15, 1978. Under Section 1 of Article IV of the two agreements, WTG was required to take and pay for, or pay for even if not taken, 80 percent of the delivery capacity (deliverability) of Exxon's wells. If the gas production and allocation was subject to the rules and regulations of a governmental authority, such as the Texas Railroad Commission ("TRC") in this case, then under Section 4, the take-or-pay obligation depended on whether WTG had nominated to TRC a volume of gas averaged over the year at least equal to 80 percent of deliverability or less than 80 percent of deliverability. If WTG had nominated at least 80 percent of deliverability, it was obligated to take-or-pay the lesser of the allowables allocated to Exxon's wells by TRC or 80 percent of deliverability. On the other hand, in the event WTG nominated less than 80 percent of deliverability during each contract year, its minimum obligation would be to pay for

that volume of gas which would have been WTG's obligation if its nominations had been 80 percent of deliverability. WTG also had the right under Section 3 to take at anytime during the term of the agreement, the quantity of gas which it had been required to pay for but had not previously taken.

It is undisputed that Exxon's gas wells and production were at all material times subject to the orders, rules and regulations of TRC. It is also undisputed that throughout much of the terms of the agreements, WTG nominated less than 80 percent of the deliverability of Exxon's wells. All of the parties agree that Section 4 of Article IV is the controlling provision of the two contracts. Although all parties seemingly agreed initially that this provision is unambiguous, they do not agree on the proper method of calculating the minimum "pay" obligation mandated by the provision. At some point during post-trial proceedings, Exxon's position changed and it now argues that the provision is ambiguous.

WTG's position is that the take-or-pay liability of WTG was to be calculated by

or pay for whether or not received, during each year, the contract volume of gas per day, equal to eighty percent (80%) of the aggregate maximum delivery capacity of Seller's wells....

. . . . .

Section 3. Should Buyer fail to purchase and receive from Seller during any year the minimum quantities of gas which Buyer was required to purchase and receive from Seller during such year pursuant to the provisions of Section 1 of this article, which failure was not due to physical nonavailability of gas, causes solely within the control of Seller, regulation by governmental authority or force majeure intervention, then within ninety (90) days after the end of such year Buyer shall pay Seller for that quantity of gas which ... Buyer was required hereunder to purchase and receive from Seller during such year and the quantities of gas actually purchased and received by Buyer from Seller's properties during such year.... If in any year Buyer fails to purchase and receive from Seller's properties during such year the minimum quantities of gas which Buyer was required to purchase and receive [therefrom] ... pursuant to the provisions of Section 1 of this article, Buyer shall have the right at any time during the remaining term of this agreement to take and receive the quantity of gas which it

paid for but did not receive during the year when such deficiency occurred....

Section 4. During any year when the production of gas from Seller's properties is subject to allocation under the laws, orders, rules and regulations of any governmental authority based on nominations made by pipeline purchasers and Buyer has nominated to such authority a volume of gas averaged over such year equal to or greater than the minimum daily quantities as determined pursuant to Section 1 of this article, for such year, the minimum daily quantities of gas Buyer is obligated to take and pay for, or pay for though not received for such year, shall be the lesser of (1) the allowable volumes of gas so allocated to Seller's properties by governmental authority, or (2) said minimum daily quantities of gas determined pursuant to Section 1 of this article.

In the event Buyer's nominations averaged over such year are less than the minimum daily quantities of gas as determined pursuant to Section 1 of this article, Buyer's minimum obligation to take and pay for or pay for though not received for such year, shall be that volume of gas which would have represented Buyer's obligation if Buyer's nominations had been equal to the minimum daily quantity of gas as determined pursuant to Section 1 of this article.

taking the lesser of 80 percent of deliverability and a hypothetical TRC allowable calculated as though WTG had nominated 80 percent of deliverability. Exxon, on the other hand, interpreted the provision in question in three different ways. First, Exxon's invoices and supporting deficiency calculations for 1983 and 1984 reflect that it interpreted the take-or-pay obligation to be the lesser of the allowables and 80 percent of deliverability. Second, the Exxon invoices on Contract No. 3530 for the years 1985 through 1988 showed a take-or-pay obligation calculated on the basis of 80 percent of deliverability for each month, even when the allowables for the month were the lesser amount. Finally, Exxon in its third approach relied on a study and testimony of its expert witness, Donald Rhodes, who determined WTG's take-or-pay liability by taking the lesser of 80 percent of deliverability or a hypothetical TRC allowable, the latter being calculated as if WTG had *nominated and taken* 80 percent of each well's deliverability.

### JURY VERDICT

At the conclusion of the evidence, five questions were submitted to the jury. First, it found that WTG had failed to purchase and receive from Exxon the minimum quantities of gas required by the contracts. Second, it found in dollars and cents the specific amounts for each contract that WTG should have paid to Exxon for the required minimum quantities of gas which were not purchased for each of the years in question.[5] In answer to the third question, it found that Cabot Corporation had agreed to assume the debts and obligations of WTG and Pioneer Corporation

(Cabot's predecessor from which it acquired all of the stock in WTG) under the contracts. In the last two questions, it found that Exxon and Pioneer intended the guaranty to cover take-or-pay obligations but only as to Contract No. 3538.

### POINTS OF ERROR

In this appeal, WTG brings eight points of error and Mesa assigns twenty-two points. Additionally, Exxon brings two conditional cross points. For convenience sake, the points of error will as much as possible be considered in groups with the same general complaint and standard of review.

### AMBIGUOUS v. UNAMBIGUOUS CONTRACT

Mesa's Points of Error Nos. Two through Eight and WTG's Points of Error Nos. One and Four assert in various fashions that the court erred in rendering judgment on the verdict because the take-or-pay provisions of the contracts are unambiguous and the court failed to make a determination on the question of ambiguity, submit proper issues or give the jury any guidance. This resulted in the jury arriving at damage verdicts for the contracts and years in question based on three different and inconsistent interpretations of WTG's take-or-pay obligations. Some of these same points also include sufficiency of evidence challenges which stem from the trial court's failure to make a determination on the ambiguity question. Intertwined with the ambiguity issue is the question of whether some of the testimony was parol evidence erroneously admitted to explain or vary unambiguous provisions. Under

---

5.          QUESTION NO. 2

What amount of money, if any, should have been paid to Exxon by West Texas within 90 days of the end of each contract year listed

Contract 3530
| 1983 | 977,986.86 |
| 1984 | 481,472.24 |
| 1985 | 1,600,728.67 |
| 1986 | 5,723,722.03 |
| 1987 | 6,132,966.24 |
| 1988 | 5,811,324.31 |

below under Contracts 3530 and 3538 as payment for the required minimum quantities of gas which were not purchased during that year? Answer in dollars and cents, if any, for each of the contracts and contract years.

Contract 3538
| 1983 | 269,319.48 |
| 1984 | 363,359.88 |
| 1985 | 125,993.70 |
| 1986 | 527,753.52 |
| 1987 | 538,465.36 |
| 1988 | 170,678.84 |

Mesa's sixteenth point of error, complaint is made that the trial court erred in rendering judgment against it in conformity with the jury's answer because the guaranty was unambiguous and did not cover take-or-pay obligations.

Appellants never wavered from their position before, during and after the trial that the provision of the second paragraph of Section 4 of the contracts' Article IV is unambiguous. Exxon on the other hand in its trial pleadings, pled first that the paragraph is unambiguous but in the event that the court disagreed with its interpretation, pled in the alternative that the provision in question is ambiguous. There was evidence that prior to the suit, Exxon employees took the position that the provisions of Section 4 were unambiguous and was "an error on Exxon's part." [6] As previously indicated, during the trial and post-trial proceedings, Exxon seemingly took opposite stances depending on whether its or Appellants' witnesses were testifying.[7] Although the question came up repeatedly, the trial judge never indicated to the parties or to the jury whether he had determined the provision to be ambiguous or unambiguous. Based on his evidentiary rulings and his failure to explain to the jury what the provision meant, his position is unclear. In any event, the manner in which the charge was given to the jury, which allowed the jury to determine whether the provision was ambiguous or not, and if so, what it meant, without any guidance, was erroneous.

■■■ If the trial court has not made a determination on the question of whether a contract is ambiguous before a jury trial commences, it is incumbent on the judge when it first becomes apparent during trial that at least one of the parties is claiming ambiguity, supported by adequate pleadings, to examine the provisions in question and determine at that time whether or not the contract is or is not ambiguous. This is necessary, among other reasons, so that the court can properly rule on evidentiary objections and submit a substantially correct charge. It is well established that the question of whether a contract is ambiguous is one of law for the court to decide after examining the contract as a whole in light of circumstances existing at the time the contract was signed. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 518 (Tex.1980). A contract is not ambiguous if, after applying the rules of construction, the provisions in question can be given a certain or definite legal meaning or interpretation. *Coker,* 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). Conversely, the contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker,* 650 S.W.2d at 393.

■■■ In construing a contract, the court should ascertain the objective intent of the parties as expressed in writing itself. *Sun Oil Company (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). It should do this by examining the entire instrument, harmonizing and giving effect to all provisions to the extent possible so that none will be rendered meaningless. *Coker,* 650

**6.** In a March 30, 1984 Exxon interoffice memorandum to D.L. Clemmer, referring to take-or-pay deficiency calculations under the first paragraph of Article IV, Section 4, G.H. Hacke said: "The provision that provides for the use of allowables in determining contract obligation appears to be an error on Exxon's part."

In a second memorandum to D.L. Clemmer, dated April 1, 1986, it is readily apparent that another employee, G.T. Theriot, interpreted the second paragraph of Section 4 the same way WTG and Mesa did, i.e. on the basis of calculated allowables and actual takes, which "would require going through the same calculations the RRC goes through for the entire 12 months,

with the assumption that West Texas Gathering had nominated that percentage [80 percent of deliverability] required to give Exxon the minimum daily quantity."

**7.** Late in the trial, Exxon objected to Joe Foy, Appellants' expert, being allowed to testify as to his interpretation of Section 4, Article IV of the contract as "an encroachment on the powers of the Court in that the Court is the one charged with the responsibility of telling this jury what the contract means and the effect of the statutes and regulations and the question of the appropriate interpretation of this contract is not an issue that will be submitted ... to the jury...."

S.W.2d at 393. A party's present interpretation of a disputed provision is irrelevant as to a determination of the intent of the parties. *First City National Bank of Midland v. Concord Oil Company*, 808 S.W.2d 133, 136 (Tex.App.—El Paso 1991, no writ). When a contract, on its face, can be given a definite legal meaning, parol evidence is not admissible to render it ambiguous. *Sun Oil Company*, 626 S.W.2d at 732. It is only after a determination by the court that the contract is ambiguous that parol evidence becomes admissible and then only to assist the fact finder in determining what the subjective intent of the parties was at the time they entered into the contract.

In the instant case, Exxon did not obtain a determination of ambiguity from the court and the court made no such determination. Exxon argues that it impliedly did so by the manner in which it submitted the case to the jury. Even if the court had impliedly ruled that the contracts were ambiguous, as Exxon now contends, the only language in the charge on intent of the parties referred to the coverage of the guaranty provision of the contracts, not to the method of take-or-pay calculation. Question No. 1 inquired merely: "Do you find that West Texas failed to purchase and receive from Exxon during any year the minimum quantities of gas required by the Contracts?" The wording of this question assumes that the meaning of the contract is clear and unambiguous and the only question is one of breach. The court gave no accompanying instructions, definitions or reference to any contract provision, let alone any language it considered to be ambiguous.

If Exxon had been seriously relying on an ambiguity in Section 4 of Article IV, it should have requested an instruction requiring the jury to interpret the specific ambiguous language from the facts and circumstances surrounding the making of the contract.[8] The jury was left to fend for itself in determining from the evidence and argument what the provisions meant and which one of at least three different interpretations it should follow in determining its answers to the damage questions. As a result of the confusion, the jury utilized evidence in arriving at its damage answers based on the three different interpretations, each of which was inconsistent with the others. For the years 1983 and 1984 on Contract 3530, the jury in its verdict found exactly the amounts invoiced by Exxon to WTG on an interpretation that WTG's obligation for take-or-pay was the lesser of 80 percent of deliverability and the actual allowables assigned by TRC. For the years 1985 through 1988 on that same contract, it arrived at answers in exactly the same amounts of invoices which had been calculated on an interpretation that WTG's obligation was for 80 percent of deliverability irrespective of the allowables set by TRC. For all of the years on Contract 3538, the jury resorted to the exact amounts calculated by Rhodes based upon his last minute theory that the allowables had to be recalculated using a theoretical take equal to 80 percent of deliverability. On these grounds alone, the points of error under consideration will be sustained.

We now turn to the question of whether Article IV, and particularly the second paragraph of Section 4, is ambiguous or unambiguous. We conclude that the second paragraph is not ambiguous when considered in conjunction with the other provisions of Article IV and especially the first paragraph of Section 4. We believe that from the wording of Section 4 when considered with the remainder of Article IV, the second paragraph can be given a definite and certain legal meaning without resort to parol evidence. It is clear and the parties agree that Section 1 states the basic formula for the buyer's take-or-pay obligation: That the buyer is required to purchase and receive and pay for, or pay for even if it doesn't receive, during each year, that volume of gas per day equal to 80 percent of the aggregate maximum delivery capacity (deliverability) of the sell-

---

8. The Texas Pattern Jury Charges suggests a proper method of submitting a question of ambiguity to the jury. 4 State Bar of Texas, Texas Pattern Jury Charges PJC 101.08 (1990).

er's wells. This section alone would apply if there was no governmental authority, such as TRC, regulating the production of gas. Section 1 says nothing about nominations, or actual or theoretical "takes".

Section 4, on the other hand, applies to the situation we have here, where all of the gas production is subject to allocation under state laws and the rules and regulations of TRC. The first paragraph relates to the circumstance where the buyer has nominated to TRC for the year in question at least 80 percent of deliverability as defined by Section 1. In that case, the buyer is obligated to receive and pay for, or pay for even though not received the lesser of (1) the allowable volumes of gas allocated by TRC to the seller's wells, or (2) the volumes of gas equal to 80 percent of deliverability, as determined under Section 1. All of the parties agree that under this paragraph, the allowables set by TRC would be calculated in part on the basis of WTG's actual takes (what it had actually purchased).

The second paragraph then provides for the situation where the buyer's nominations to TRC averaged over the year were less than 80 percent of deliverability, determined in accordance with Section 1, in which event, the buyer's minimum take-or-pay obligation would be that volume of gas equal to 80 percent of deliverability. In other words, for purposes of calculating the buyer's obligation to take-or-pay for gas regulated by TRC, if the buyer nominates less than 80 percent of deliverability, it will be assumed that the buyer nominated the 80 percent. In either event, the calculations would be the same, the only difference between the two paragraphs of Section 4 being that one applies when the buyer has nominated at least 80 percent of deliverability and the other applies when the buyer's nominations fall below that percentage in which event it would be assumed for purposes of making the calculation that WTG had nominated 80 percent of deliverability. It would make no sense at all to interpret the section to mean that if the buyer nominated at least 80 percent of deliverability, it would be obligated to pay the lesser of the allowables set by TRC and

80 percent of deliverability, but if the buyer nominated 75 percent of deliverability, for example, then it would be obligated for the full 80 percent of deliverability regardless of the allowables set by TRC.

Although we can understand Exxon's argument that such an interpretation would allow WTG to manipulate its monetary obligation by making low nominations, or by high nominations and low takes, which in turn could have a "distorting" effect on the allowables determined by TRC, that does not make the meaning of the paragraph ambiguous. Several of Exxon's own employees had given the paragraph the same interpretation we have concluded is the correct interpretation. This is shown by internal memoranda from Exxon's files, previously mentioned, and by the testimony of Exxon's Jim Ivy, who had negotiated the contracts and who agreed that in making the take-or-pay calculations "you can't change the takes after the fact because the takes are already taken or not taken." Rhodes undoubtedly had the expertise to make calculations in accordance with his interpretation of the contract as written. However, it was error for the court to allow him, in effect, to reconstruct the contract by testifying that the provision in the second paragraph of Section 4 calling for a calculation based on a theoretical nomination (expressly required by the provision), required an assumption that the amount taken was equal to that theoretical nomination (not required or even suggested by the wording).

We sustain WTG's Points of Error Nos. One and Four and Mesa's Points of Error Nos. Two through Eight. Because of our disposition of these and other points, we will not address Mesa's sixteenth point.

### ADMISSION OR EXCLUSION OF EVIDENCE

■ In Mesa's Points of Error Nos. One, Nine, Ten, Eleven, Seventeen and Eighteen, WTG's Points of Error Nos. Seven and Eight, and Exxon's two cross points, the parties complain of various trial court errors in the admission or exclusion

of evidence. Some of these complaints relate to the alleged failure of a party to identify a potential witness in answer to interrogatories or to supplement its answers as required by Tex.R.Civ.P. 166b. Mesa's seventeenth and eighteenth points claim trial court error in admitting the testimony of Kathleen Cassidy on the meaning of the guaranty agreement, over proper objection that she had not been identified as a person having knowledge of the intent of the parties or as an expert with respect to that agreement.

Specifically, Mesa complains in its first and eleventh points of error and WTG asserts in its Point of Error No. Seven that the trial court erred by allowing Exxon's witness, Donald (or Donnie) Rhodes, to testify as to the meaning of the contract provisions in dispute and as to his calculations, and by admitting his damage study into evidence. The objections were based upon the ground that Exxon had violated the discovery rules and on the ground that the testimony relating to what the parties must have intended was inadmissible parol evidence.

The Appellants argued that Exxon violated the discovery rules by failing to supplement its answers to interrogatories and to furnish the Appellants with a copy of his report and calculations upon which his testimony would be based, as required by Tex.R.Civ.P. 166b.6. Under this rule, a party is required to supplement its response to interrogatories not less than thirty days prior to the beginning of the trial:

a. ... if he obtains information upon the basis of which:

(1) he knows that the response was incorrect or incomplete when made;

(2) he knows that the response though correct and complete when made is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading; or

b. If the party expects to call an expert witness when ... the subject matter of such expert witness' testimony has not been previously disclosed in response to an appropriate inquiry directly addressed to these matters, such response must be supplemented to include ... the substance of the testimony concerning which the expert witness is expected to testify, as soon as is practical, but in no event less than thirty (30) days prior to the beginning of trial except on leave of court.

Tex.R.Civ.P. 166b.6.

Rhodes was first identified in January 1990 as an expert witness by Exxon in answer to interrogatories. In response to further interrogatories in March and May 1990, Exxon stated:

Mr. Rhodes is expected to testify regarding calculations he is making in connection with gas taken and not taken under the subject contracts. Specifically, he is making take-or-pay calculations, ratable take calculations and canceled allowable calculations. He may also testify about the Texas Railroad Commission's proration and allowable system and the effect on gas allowables of West Texas' nominations and takes. Exxon expects to receive a report from Mr. Rhodes in the near future.

In early September 1990 in connection with the deposition of Rhodes, the Appellants were furnished copies of Rhodes' report, dated July 25, 1990, setting out his damage calculations of WTG's take-or-pay obligation under the contract where WTG had failed to nominate 80 percent of deliverability. In both his report and his deposition testimony, he based his calculations on 80 percent of deliverability, without taking into account the "allowables" as determined by the TRC (which we have previously held was required by a plain reading of Article IV).

Also in September, Cabot in Number 18.A. of a second set of interrogatories requested Exxon to:

State whether you contend that the amount of damages and calculation of such damages as are set out in the written report of your expert, Donnie Rhodes, dated July 25, 1990, is accurate and properly sets forth your position as to the proper calculation of damages in this case.

Exxon answered Cabot's interrogatory on September 21, 1990, forty-five days prior to trial, in the following manner:

A. As Mr. Rhodes testified at his deposition, the July 25, 1990 report is preliminary and contains some inaccuracies. Some of those inaccuracies were corrected and copies of the corrections were furnished to all counsel prior to or at Mr. Rhodes' deposition. Thus, the July 25, 1990 report, standing alone, is not completely accurate and does not completely set forth the proper calculation of damages in this case.

Exxon does contend that the methodology used by Mr. Rhodes to calculate the various take-or-pay studies shown in his report is accurate.

In response to another interrogatory, Exxon stated that it had no plans to present any "measure of damages other than those which result from the methodology employed by Mr. Rhodes in his studies" and that no decision had been made to present more than one damage theory at trial. In answer to Interrogatory 18.B., Exxon stated:

2. If Exxon concludes that the theoretical allowable calculation described in paragraph 2 of Section 4, Article IV, in Contracts 3530 and 3538 can be calculated, those calculations will be prepared by Mr. Rhodes and may be used in take-or-pay calculations presented at trial.

Then on October 31, 1990, five days before trial, a further deposition of Rhodes was taken, in which it was revealed for the first time that at the request of one of Exxon's trial counsel some three weeks prior to the deposition, Rhodes had begun a new (second) study and calculations based on a theoretical allowable assuming 80 percent nominations and 80 percent takes. Copies of the second report were furnished to WTG. Between October 31 and November 4, Rhodes again revised his study and calculations to correct a number of errors. Copies of the new calculations based on this latest (third) study were furnished to

WTG in the evening before trial and to Mesa on November 7 (two days after trial had commenced). As a result of the latest changes contained in the 210 page report, WTG's take-or-pay liability was increased by approximately $2 million. Exxon placed its entire reliance on this revised version of the October 31 study to prove its damages.

Although Rhodes contended at trial that his interpretations had not changed between September 8 (his first deposition) and October 31 (his second deposition), he had admitted in the latter deposition that they had changed. Based on the record before us, Rhodes' new interpretation of the contracts and his new study made Exxon's previous answers to interrogatories incomplete, inaccurate and misleading. Supplementation was required not less than thirty days prior to the commencement of trial unless the court found that good cause existed for permitting later supplementation. Tex.R.Civ.P. 166b.6.a.(2). The court after expressing self-doubts [9] about his ruling, overruled Appellants' objections and admitted Rhodes' study and testimony. Permission for late supplementation was neither requested nor given, nor was a finding of good cause made by the court.

Tex.R.Civ.P. 215.5 provides that when a party fails to respond to or supplement his response to a request for discovery, he *shall not* be permitted to present evidence which he was under a duty to provide in his response or supplemental response, unless the court finds that good cause existed for such failure. It also provides that the burden of showing good cause is on the party offering the evidence and such good cause must be shown in the record.

■■■■ The purpose of Rule 215.5 is to require complete responses to discovery as a means of promoting responsible assessment of settlement and preventing trial by ambush. *Alvarado v. Farah Manufacturing Company, Inc.*, 830 S.W.2d 911, 914 (1992). Absent a showing and finding of good cause, the sanction imposed by Rule

---

9. "I'm going to overrule what may be a perfectly good objection, but I will allow the witness to testify."

215.5 for failure to make discovery as required by the rules is mandatory. *Alvarado*, 830 S.W.2d at 914; *Morrow v. H.E.B., Inc.*, 714 S.W.2d 297 (Tex.1986); *The Southland Corporation v. Burnett*, 790 S.W.2d 828 (Tex.App.—El Paso 1990, no writ).

The facts of this case present a textbook illustration of the reason for Rule 215.5 and why it must be stringently enforced by the courts. While the Appellants were aware from Rhodes' September deposition and from Exxon's timely responses to interrogatories that Rhodes might attempt further calculations to compute theoretical allowables, there was no indication that those calculations would be based on a new assumption that, at least for the purposes of the second paragraph of Section 4, "takes" essentially equalled production or deliverability. There is no doubt left by the record that interjecting a new theory and springing a new study and calculations on the eve of trial (and for Mesa, during the trial) represented trial by ambush.

▮▮▮ Having determined that the trial court erred by allowing Exxon to introduce Rhodes' latest theory, testimony and calculations over Appellants' objections, we must next determine whether the error requires reversal. *Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989). In order to obtain reversal of a judgment where the complaint is that the trial court erroneously admitted or excluded evidence, an appellant must show (1) that the trial court's ruling was in fact erroneous; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *Boothe*, 766 S.W.2d at 789; *Gee v. Liberty Mutual Fire Insurance Company*, 765 S.W.2d 394, 396 (Tex. 1989); Tex.R.App.P. 81(b). Reversible error does not usually occur in connection with evidentiary rulings unless the whole case turns on the particular evidence admitted or excluded. *Shenandoah Associates v. J & K Properties, Inc.*, 741 S.W.2d 470, 493 (Tex.App.—Dallas 1987, writ denied); *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 837 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). The error is harmless if the erroneously admitted evidence is merely cumulative and not controlling on a material issue dispositive of the case. *Gee*, 765 S.W.2d at 396; *Boothe*, 766 S.W.2d at 789; Tex.R.App.P. 81(b)(1).

In this case, Exxon depended entirely on the testimony of Rhodes to establish the Appellants' take-or-pay obligations and to prove its damages. In its answers to Question No. 2, the jury found damages in exactly the same amounts to which Rhodes had testified for each of the years 1983 through 1988 on Contract 3538. In its findings for damages on Contract 3530, the jury relied on the exact amounts invoiced by Exxon to WTG during the same years even though those amounts were unsupported by the contract and the testimony. However, the fact that the jury chose to ignore Rhodes' calculations and testimony in arriving at its findings on Contract 3530 provides no help to Exxon since Rhodes' testimony and calculations were the only material evidence on the damage question. Accordingly, Mesa's Point of Error No. One and Eleven and WTG's Point of Error No. Seven are sustained.

Mesa in its ninth point of error, and WTG in its Point of Error No. Eight, assert harmful error by the trial court in permitting Exxon over their objections to introduce the deposition testimony of Robert W. Sledge, despite the fact that he had not been identified as a person having knowledge of relevant facts in answer to interrogatories submitted by both WTG and Mesa many months before the commencement of the trial. In its tenth point, Mesa claimed error for the same reason when the trial court over its objection permitted the deposition testimony of A.M. Derrick. Exxon was permitted to supplement its answer identifying Sledge and Derrick after the trial had commenced and after their depositions had been read to the jury.

In its motion to supplement filed November 12, 1990, and its argument during trial, Exxon claimed the existence of good cause because (1) Sledge and Derrick had been identified both as potential witnesses in response to interrogatories and as corporate representatives of El Paso Natural

Gas Company, a third party defendant until the day of trial when the claim against it was dismissed, and thus Exxon believed that they would be available for cross-examination; (2) the testimony of the two witnesses was important as it related to facts surrounding the drafting of Article IV of the contract; (3) WTG and Mesa suffered no surprise or prejudice since they not only knew of these possible witnesses but had taken their depositions prior to trial (the record shows in September 1990). Not made known to the trial court but argued for the first time in its brief and reply brief is the fact that both WTG and Cabot in their respective supplemental responses made in early October 1990 to Exxon's interrogatories identified Derrick and Sledge as potential fact witnesses.

Because WTG and Cabot had themselves identified Derrick and Sledge, it is unnecessary for us to address the good cause question. Nor is it necessary for us to consider the question of whether Exxon had a right to rely on the response of a third party defendant, no longer in the case, to interrogatories submitted to it in connection with the cross-action.

▇▇▇ Where another party in the same suit has in response to interrogatories identified a potential witness, a party may call that witness to testify even though the latter party failed to name that witness as a person having knowledge of relevant facts in answer to interrogatories. *Ticor Title Insurance Company v. Lacy,* 803 S.W.2d 265 (Tex.1991) and *Smith v. Christley,* 755 S.W.2d 525, 530 (Tex.App.—Houston [14th Dist.] 1988, writ denied).

In *Ticor,* the Supreme Court in a per curiam opinion denying Ticor's application for writ disapproved of the Dallas Court of Appeals' analysis in *Lacy v. Ticor Title Insurance Company,* 794 S.W.2d 781 (Tex. App.—Dallas 1990), *writ denied,* 803 S.W.2d 265 (Tex.1991) on the issue of when one party may rely on the interrogatories of other parties in the same case. It cited with approval instead the approach of the Houston Court of Appeals on the subject in *Christley* and particularly the Houston Court's reasoning that:

A party must be able to rely on the interrogatories and answers of other parties in the same suit. Otherwise a multi-party case would require redundant interrogatories with identical questions and answers.

*Christley,* 755 S.W.2d at 530. In the latter case, the Court of Appeals held that the trial court erroneously allowed the plaintiff's attorney to testify on his fees despite the fact that he had not been identified as an expert in response to interrogatories propounded by a third party no longer in the case. The defendant who was objecting to the testimony but had not himself propounded appropriate interrogatories to the plaintiff, nevertheless had a right to rely on the failure of the plaintiff to identify the expert witness in response to the third party interrogatories requesting such information. Other cases support the *Ticor/Christley* reasoning and result: *Ward v. O'Connor,* 816 S.W.2d 446 (Tex.App.—San Antonio 1991, no writ); *First Financial Development Corp. v. Hughston,* 797 S.W.2d 286 (Tex.App.—Corpus Christi 1990, no writ). Mesa's ninth and tenth points of error and WTG's eighth point of error are overruled.

As a result of our disposition of other points of error, it is unnecessary for us to reach Mesa's seventeenth and eighteenth points of error relating to the testimony of Cassidy, a former Exxon employee. Exxon has asserted in two conditional cross points that the trial court erred in excluding certain evidence relating to an interpretation of the take-or-pay provisions in a 1958 contract between Exxon and WTG. The exclusion of this evidence resulted from the sustainment of relevancy and prejudicial effect objections. In view of our disposition of Appellants' points of error and the case, it is unnecessary for us to reach these cross points.

## FACTUAL AND LEGAL INSUFFICIENCY POINTS

▇▇▇ In Mesa's Points of Error Nos. Three, Five, Eight, Nineteen and Twenty, and WTG's Points of Error Nos. Two,

Three and Five, Appellants assert that there was either no evidence or insufficient evidence to support the verdict and judgment. When presented with a "no evidence" challenge, the appellate court should consider only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury verdict or court finding. All evidence and inferences to the contrary are to be disregarded. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Company of America,* 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the questioned finding, the no evidence point fails. *Stafford,* 726 S.W.2d at 16.

■ When a factual sufficiency challenge is brought, the Court must first examine all of the evidence, *Lofton v. Texas Brine Corporation,* 720 S.W.2d 804, 805 (Tex.1986); and after considering and weighing all of the evidence, the Court may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). Since an appellate court is not a fact finder, it may not pass upon the credibility of the witnesses or substitute its judgment for that of the trier of fact, even if the evidence would support a different result. *Clancy v. Zale Corporation,* 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Where there is conflicting evidence, the jury's verdict on such issues is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508 (1947).

We have previously determined that Rhodes' latest report and testimony were erroneously admitted and that in the absence of such evidence, there was no evidence to support the jury's answers with respect to damages. We therefore sustain WTG's Points of Error Nos. Two, Three and Five and Mesa's Points of Error Nos. Three, Five, Eight, Nineteen and Twenty

insofar as they purport to be no evidence challenges.

## STATUTE OF LIMITATIONS

■ In its twenty-second point of error, Mesa asserts that the trial court erred by rendering judgment against Mesa on the guaranty executed by Pioneer in December 1982, as amended on February 28, 1983. The evidence shows that Mesa generally assumed Pioneer's guaranty obligation when it acquired Pioneer's assets in June 1986: "[Mesa] ... hereby assumes and agrees to pay, perform and discharge ... [all liabilities and obligations of Pioneer, fixed or contingent]."

Exxon agrees with Mesa that Exxon's action against Pioneer for take-or-pay obligations due on the contracts for the years 1983 and 1984 would have accrued ninety days after the end of each year, or March 31, 1984 and March 30, 1985, respectively.[10] Exxon did not sue Mesa until March 2, 1990, more than four years after the causes of action accrued against the original guarantor, Pioneer. However, Exxon argues that a new four year limitations period began to run in June 1986, when Mesa assumed Pioneer's obligations, based on the principle that Mesa's assumption was a new and separate obligation. Mesa urges that even if its assumption of Pioneer's obligations could be considered a new promise, it did not meet the requirements of Tex.Civ.Prac. & Rem.Code Ann. § 16.065 (Vernon 1986). That statute states that:

> An acknowledgment of the justness of a claim that appears to be barred by limitations is not admissible in evidence to defeat the law of limitations if made after the time that the claim is due unless the acknowledgment is in writing and is signed by the party to be charged.

To bring a promise to pay or an assumption of an obligation or claim otherwise barred by limitations under this statute, it must (1) be in writing; (2) contain an unequivocal acknowledgment of the justness or the ex-

10. Our computation would indicate March 30, 1984 and March 31, 1985 rather than Mesa's and Exxon's dates since 1984 was a leap year.

istence of the particular obligation or claim; and (3) express a willingness to honor the obligation or claim. *House of Falcon, Inc. v. Gonzalez*, 583 S.W.2d 902, 905 (Tex.Civ. App.—Corpus Christi 1979, no writ).

Exxon contends that neither the statute nor *Falcon* have any application to a promise or assumption of obligations under a guaranty made in connection with claims that have not yet become barred by limitations (as in this case), citing *Zuehlke v. Irvin*, 32 S.W.2d 868, 869 (Tex.Civ.App.— Austin 1930, no writ). *Zuehlke* involved Article 5539, Texas Revised Civil Statutes, the predecessor of Section 16.065, with substantially the same language. Although *Zuehlke* contains dictum that Article 5539 has no application to a parol promise to pay an indebtedness not barred by limitations at the time the promise was made, it is limited by its facts to a situation where the oral promise to pay is supported by a new and valuable consideration, in that case a promise to extend the indebtedness due date. On that basis, we reject *Zuehlke* as authority for the proposition stated in the dictum, but it is authority for the proposition that a promise not within the statute must be supported by a new and valuable consideration.

By its plain language, Section 16.065 is applicable to an acknowledgment of the justness of a claim, or promise to pay an indebtedness, if the acknowledgment or promise is made after the claim is due, regardless of whether or not the claim is barred by limitations. *Trautmann Brothers Investment Corp. v. Del Mar Conservation District*, 440 S.W.2d 314, 315 (Tex. Civ.App.—Waco 1969, writ ref'd n.r.e.). In any event, Mesa's promise to assume and pay Pioneer's obligations was made not to Exxon but to Pioneer and did not include an unequivocal acknowledgment or promise to pay Pioneer's obligation under the guaranty. Nor was it a new promise, supported by a new and valuable consideration flowing from Exxon, to pay a claim under the guaranty for the amounts then owed by WTG on its take-or-pay obligation.

We therefore hold that Mesa's assumption of Pioneer's obligations in June 1986 did not have the effect of removing the guaranty from the limitations periods. Exxon's claims against Mesa under the assumption of Pioneer's guaranty for the years 1983 and 1984 were barred by limitations. Mesa's twenty-second point of error is sustained.

Mesa in its Points of Error Nos. Twelve through Fifteen and Twenty-One and WTG in its Point of Error No. Six, assert trial court error by its refusal to submit in the jury charge certain requested instructions and questions. In view of our disposition of other points of error, it is unnecessary for us to consider these points.

Since we have sustained the no evidence points of error relating to the damage questions, we reverse the judgment of the trial court and render judgment that Exxon take nothing against the Appellants herein.

WOODARD, J., not participating.