**EXXON CORPORATION, Petitioner,**

v.

**WEST TEXAS GATHERING COMPANY, Cabot Corporation, Mesa Limited Partnership, and Mesa Operations Limited Partnership, Respondents.**

No. D–3041.

Supreme Court of Texas.

June 30, 1993.

Rehearing Overruled Sept. 29, 1993.

**2.** Under Rule 106(b), a party need only show that attempts have failed under either Rule 106(a)(1) or Rule 106(a)(2). Tex.R.Civ.Pro. 106.

Shannon H. Ratliff, Marc Ol Knisely, Austin, Mike A. Hatchell, Tyler, S. Jack Balagia, Edward de la Garza, Houston, and Robert Scogin, Kermit, for petitioner.

Barry Bishop, David C. Duggins, Austin, James A. Fisher, Michael H. Collins, Dallas, and Donald M. Hunt, Lubbock, for respondents.

## OPINION

DOGGETT, Justice.

This case presents questions regarding the proper interpretation of a take-or-pay gas

contract and the scope of a party's obligation to supplement discovery responses concerning expert testimony. Exxon Corp. obtained a trial court judgment for contractual damages based upon a jury verdict. The court of appeals reversed and rendered a take nothing judgment, holding both that the contract was unambiguous and that certain expert testimony regarding damages was improperly admitted. 837 S.W.2d 764. We determine that the contractual clause at issue here was ambiguous and therefore properly submitted to a jury, and that new damages calculations belatedly revealed by an expert are admissible at trial under the particular circumstances of this case. Accordingly we reverse the judgment of the court of appeals and remand to that court for consideration of other points.

## I.

This dispute arose out of two contracts for the purchase of natural gas from producer Exxon by West Texas Gathering Co. ("WTG"). Under these "take-or-pay" agreements, WTG was obligated to pay for minimum annual quantities of gas, whether or not actually taken. The contracts were in force from 1983 to 1988, and in 1990 Exxon filed this action for breach against WTG, its parent, Cabot Corporation, and Mesa Limited Partnership and Mesa Operating Limited Partnership ("Mesa"), an alleged guarantor of the agreements.

The relevant provisions of both contracts are identically worded and contain three al-

ternative formulas for determining the extent of WTG's take-or-pay liability, with surrounding circumstances dictating which of the three would apply.[1] Article IV, section one sets out the baseline requirement that WTG take or pay for 80 percent of the "deliverability," or maximum capacity, of Exxon's wells ("Method 1"). Where, as here, however, the maximum amount of gas the buyer may extract is governed by "allowables" set by the Texas Railroad Commission, article IV, section four controls. Under that provision, when the buyer's estimates of future demand—its "nominations" to the Railroad Commission—average at least 80 percent of deliverability, the buyer must pay for the lesser of 80 percent of deliverability or the allowable set by the Commission ("Method 2"). When nominations average less than 80 percent of deliverability, the requirement is based on a hypothetical allowable the Railroad Commission would have set if the buyer's nominations had averaged 80 percent ("Method 3"). All parties agree that, since for all relevant years WTG's nominations averaged less than 80 percent of deliverability, Method 3 governs.

## II.

Throughout this dispute, the parties have strongly differed as to the proper interpretation of the following contractual language:

In the event Buyer's nominations averaged over such year are less than the minimum daily quantities of gas as deter-

1. The relevant portions of the contracts read:

ARTICLE IV
Quantities

Section 1. **[Method 1]** Subject to all the provisions of this agreement ... Seller shall sell and deliver to Buyer, and Buyer shall purchase and receive from Seller and pay for, or pay for whether or not received, during each year, the contract volume of gas per day, equal to eighty percent (80%) of the aggregate maximum delivery capacity of Seller's wells....

Section 4. During any year when the production of gas from Seller's properties is subject to allocation under the laws, orders, rules and regulations of any governmental authority based on nominations made by pipeline purchasers and Buyer has nominated to such authority a volume of gas averaged over such year equal to or greater than the minimum daily quantities as determined pursuant to Sec-

tion 1 of this Article, **[Method 2]** for such year, the minimum daily quantities of gas Buyer is obligated to take and pay for, or pay for though not received for such year, shall be the lesser of (1) the allowable volumes of gas so allocated to Seller's properties by governmental authority, or (2) said minimum daily quantities of gas determined pursuant to Section 1 of this Article.

In the event Buyer's nominations averaged over such year are less than the minimum daily quantities of gas as determined pursuant to Section 1 of this Article, **[Method 3]** Buyer's minimum obligation to take and pay for or pay for though not received for such year, shall be that volume of gas which would have represented Buyer's obligation if Buyer's nominations had been equal to the minimum daily quantity of gas as determined pursuant to Section 1 of this Article.

mined pursuant to Section 1 of this Article, Buyer's minimum obligation to take and pay for or pay for though not received for such year, shall be that volume of gas which would have represented Buyer's obligation if Buyer's nominations had been equal to the minimum daily quantity of gas as determined pursuant to Section 1 of this Article.

Insisting that this provision is unambiguous, WTG, Cabot, and Mesa contend that it measures the buyer's take-or-pay liability by the lesser of 80 percent of deliverability or a hypothetical allowable that would have been computed by the Railroad Commission, based on a nomination level of 80 percent and the *actual* amount of gas taken. Exxon responds that the provision is ambiguous, since it could be reasonably interpreted to require the hypothetical allowable to be calculated on the basis of either *actual* takes, or a *hypothetical* level of 80 percent takes.

■ The trial court's determination as to ambiguity is implicit in its decision to submit the extent of the defendants' liability to the jury. Deciding whether a contract is ambiguous is "a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983). If a contract is unambiguous, "*the courts* will give effect to the intention of the parties as expressed or as is apparent in the writing." *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981) (emphasis added) (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). While the trial court here never made an express finding that the contract

was ambiguous, such a determination was necessary to its submission of a jury question inquiring into the amount of WTG's take-or-pay liability,[2] which required *the jury* to determine on the basis of extrinsic evidence which of the interpretations of the take-or-pay provision the parties intended. *See Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (by submitting issues to the jury designed to ascertain the parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous"). If it had not considered the contract ambiguous, the court could only have interpreted it as a matter of law.[3]

■ We conclude that the trial court was correct in finding the contract ambiguous and submitting the issue to a jury. "A contract ... is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker*, 650 S.W.2d at 393. Here, the applicable take-or-pay provision does not specify whether actual or hypothetical takes should be used in determining the amount of a hypothetical Railroad Commission allowable. Because one could reasonably interpret the contract either way, it is ambiguous.

Exxon's reading of the agreement is reasonable because it allows the risk of fluctuations in market demand to be allocated to the buyer, a central purpose underlying take-or-pay gas contracts. Even if demand for gas decreases, a take-or-pay clause ensures that a seller will receive payment for at least some minimum contract quantity each year. *See Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 680 (10th Cir.1991).

2. Question 2 inquired:
   What amount of money, if any, should have been paid to Exxon by West Texas within 90 days of the end of each contract year listed below under Contracts 3530 and 3538 as payment for the required minimum quantities of gas which were not purchased during that year?

3. The defendants further contend that Exxon's failure to request a jury instruction delineating the ambiguous language and the appropriate method of resolving the ambiguity constitutes a complete failure to submit a breach of contract cause of action. Question 1, inquiring as to breach, and Question 2, directed to damages,

were sufficient to submit a cause of action for breach of contract. Under the circumstances of this case, where there were only two conflicting constructions, both were clearly presented by evidence and argument, and one required a very significant award of damages while the other did not, the ambiguity issue was submitted to the jury. The jury could not have awarded the damages they did without accepting Exxon's construction of the agreements. Ordinarily, however, the better method of submitting a question of ambiguity in a contract to the jury is set out in 4 State Bar of Texas, Pattern Jury Charges PJC 101.01 and 101.08.

Exxon's interpretation prevents a buyer from undermining that purpose by intentionally manipulating the allowables that measure its minimum take-or-pay obligation. In Texas, the Railroad Commission regulates gas production by setting "allowable" limits on production, which are computed based on the two primary bases for measuring market demand—the nominations and takes reported by buyers.

Because both nominations *and* takes significantly factor into the setting of allowables, the contract's silence as to the proper level of takes to consider in determining the hypothetical allowable under Method 3 is critical. When either nominations or takes decrease, allowables also go down. If *actual* takes must be used, then the buyer can intentionally take less gas so as to incur less liability under the contract. Allowing such a manipulation is inconsistent with the purposes of a take-or-pay contract, and is resolved by Exxon's interpretation, which sets hypothetical takes at the same level as hypothetical nominations, leaving no room for the Buyer to reduce intentionally its own contractual obligation. On the other hand, the defendants correctly point out that the second paragraph of section four mentions only one hypothetical factor—nominations. One could therefore reasonably read the contract as contemplating only one deviation from reality in computing the allowable in Method 3—the assumption that the buyer nominated 80 percent of deliverability when in fact it did not.

### III.

We next address whether the trial court was required by Texas Rule of Civil Procedure 215.5 to exclude the testimony of Exxon's damages expert, Donald Rhodes, who

had been identified in interrogatory responses in January 1990.[4] At his initial deposition in September, two months before trial, Rhodes calculated damages at approximately $28 million based on Method 1, under which he computed the baseline take-or-pay obligation of 80 percent of deliverability without accounting for either Railroad Commission allowables or WTG's nominations. While acknowledging its applicability under the terms of the contract, he chose not to employ Method 3 on the grounds that WTG's practice of nominating greater amounts than it actually took had distorted allowables and made calculation under this formula difficult. Rhodes repeatedly confirmed, however, that if he were to calculate the hypothetical allowable required to assess take-or-pay liability under Method 3, "the only way it will work" is to assume not only a hypothetical nomination of 80 percent of deliverability, but also a hypothetical take of the same amount. Otherwise, the second paragraph of section four would have no "function" or "meaning." Because such a hypothetical allowable would be "very close" to 80 percent of deliverability, he estimated that Method 3 would produce approximately the same amount of damages as already calculated under Method 1. Although Exxon had not yet decided whether to attempt the Method 3 calculations, Rhodes indicated that those "evaluations need to be done." On September 21, following this deposition and more than 30 days prior to trial, Exxon supplemented its interrogatory responses concerning this matter:

> [i]f Exxon concludes the theoretical allowable calculation described in paragraph 2 of Section 4, Article IV ... can be calculated, those calculations will be prepared by Mr. Rhodes and may be used in take-or-pay calculations presented at trial.[5]

4. As required by Texas Rule of Civil Procedure 166b(6)(b), these answers provided Rhodes' name and address, and the subject matter of his testimony:

> Mr. Rhodes is expected to testify regarding calculations he is making in connection with gas taken and not taken under the subject contracts. Specifically, he is making take-or-pay calculations, ratable take calculations and cancelled allowable calculations. He may also testify about the Texas Railroad Commission's proration and allowable system and the effect

on gas allowables of West Texas' nominations and takes.

5. Respondents argue that Exxon should be bound by its further response to the same interrogatory that the "methodology used by Mr. Rhodes to calculate the various take-or-pay studies shown in his report is accurate." Because Rhodes and Exxon acknowledged that the initial calculations were based on a formula that under the contract was inapplicable in this situation, this appears to be merely a statement that the

On October 30, six weeks after his deposition and five days before trial, Rhodes presented his new calculations under Method 3, which totaled $23.6 million; he was immediately redeposed the following day. Although not requesting a continuance to study these calculations, after the deposition Cabot moved to "strike altered and untimely expert opinion testimony," which included any comment by Rhodes "which departs from his July 25, 1990 report, or contradicts his [original] deposition testimony." The trial court overruled the motion.

In this burgeoning technological age, modern trial practice increasingly involves complex factual issues requiring elaborate expert proof. In order to be prepared adequately for trial, both sides must be fully aware of the nature of both their own evidence and that of the opposing parties, and our procedural rules requiring full supplementation of discovery responses are designed to ensure this result. To that end, Texas Rule of Civil Procedure 166b(6)(b) requires parties to reveal the "substance of the testimony concerning which [their] expert witness is expected to testify" no less than 30 days before trial, and Rule 166b(2)(e) permits discovery of the mental impressions and opinions held by, and the facts known to, the expert. This information must be supplemented no less than 30 days before trial if it is no longer true and complete, and the failure to amend renders the substance misleading. Tex.R.Civ.P. 166b(6)(a).

■ Our rules do not prevent experts from refining calculations and perfecting reports through the time of trial. The testimony of an expert should not be barred because a change in some minor detail of the person's work has not been disclosed a month before trial. The additional supplementation requirement of Rule 166b(6) does require that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading.

■ Here, Exxon met its obligation to report the "substance" of Rhodes' expected testimony at the time of his first deposition and its supplemental responses to interrogatories. The defendants knew how Exxon interpreted the contract and how Rhodes believed damages should be calculated. They possessed all the information necessary both for preparing to discredit his methodology and reconstructing their own damages study based on his approach to Method 3. Not having the calculations themselves does not appear to have impaired the defendants' ability to prepare for trial. *See AmSav Group, Inc. v. American Sav. & Loan Ass'n of Brazoria County*, 796 S.W.2d 482, 486–87 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (damages calculations only partially completed at time of deposition but provided in full prior to trial testimony properly admitted where opposing party had adequate time to prepare for cross-examination).

We do not imply that a party may avoid its duty to supplement by designating "multiple-choice" expert theories and opinions during the initial stages of discovery. While Rhodes had not performed the Method 3 calculations at the time of his first deposition, he maintained throughout that, to the extent calculable, Method 3 provided the *only* proper means by which to measure WTG's take-or-pay obligation. Exxon never maintained that Methods 1 and 3 were alternative means to calculate the same damages, but only that Method 1 might provide the best evidence of damages, given the difficulty of computing them under Method 3. And, by the end of Rhodes' first deposition, he acknowledged the need to attempt the Method 3 calculations.

Because all opposing parties were aware of both Rhodes' identity and the methodology that constituted the "substance" of his trial testimony, the trial court's decision to allow him to testify is consistent with the purposes underlying our rules of procedure. Rule 215.5 provides:

[a] party who fails to respond to or supplement his response to a request for dis-

---

methodology for the initial study was accurate insofar as it calculated damages *under Method 1.*

It is not inconsistent with Exxon's adoption of Rhodes' later Method 3 calculations.

covery shall not be entitled to present evidence which the party was under a duty to provide in a response or supplemental response or to offer the testimony of an expert witness or of any other person having knowledge of discoverable matter, unless the trial court finds that good cause sufficient to require admission exists.

This rule is designed to serve the "salutary purpose" of "requir[ing] complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush." *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex.1992). Thus, we reiterate that

> [o]ur goal in promulgating Rules 166b and 215(5) and our prior opinions interpreting these rules was to encourage full discovery of the issues and facts prior to trial so that parties could make realistic assessments of their respective positions.

*Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). "A trial should be based upon the merits of the parties' claims and defenses rather than on an advantage obtained by one side through a surprise attack." *Smith v. Southwest Feed Yards*, 835 S.W.2d 89, 90 (Tex.1992). Recognizing the importance of full discovery of the mental impressions and opinions of experts prior to trial, this court refuses to condone "offensive and unacceptable use of discovery mechanisms [to conceal expert information] intended to defeat the salutary objective of discovery." *Tom L. Scott, Inc. v. McIlhany*, 798 S.W.2d 556, 560 (Tex.1990, orig. proceeding); *see also Axelson, Inc. v. McIlhany*, 798 S.W.2d 550 (Tex.1990, orig. proceeding).

A last minute material alteration of expert testimony can certainly create an ambush that is every bit as damaging as that caused by the sudden appearance of an undisclosed witness. But nothing of this sort appears to have happened here. Notice of the change in damages theory was provided more than 30 days prior to trial and the expert was fully redeposed. Rhodes' final arithmetical corrections were delivered in advance of trial together with an errata sheet explaining clearly and specifically all changes that were

being made.[6] Moreover, the Method 1 analysis described during his initial four day deposition comprised a substantial component of his new calculations under Method 3. In view of all of these circumstances, excluding Rhodes' testimony would only subvert the search for truth; it would not further the important underlying purpose of Rule 215.5 that every litigant be accorded adequate notice of its opponent's proof.

## IV.

The defendants also assert as a basis for affirming the court of appeals' judgment the failure of Exxon to challenge in either its motion for rehearing in the court of appeals or its application for writ of error the sustaining of several no evidence points as to liability. In its very limited discussion of the legal and factual sufficiency of the evidence, the court of appeals concluded that:

> We have previously determined that Rhodes' latest report and testimony were erroneously admitted and that in the absence of such evidence, there was no evidence to support the jury's answer with respect to damages. We *therefore* sustain WTG's Points of Error Nos. Two, Three and Five and Mesa's Points of Error Nos. Three, Five, Eight, Nineteen and Twenty insofar as they purport to be no evidence challenges.

837 S.W.2d at 777 (emphasis added). Three of these points contended that there was no evidence to support the jury's finding of liability because any failure to take or pay for additional volumes of gas was excused under the contract by applicable laws and regulations relating to market demand. This argument hinged on the "governmental regulations" clause of article IV, section three, which provides that WTG should not have to pay for failing to take minimum quantities of gas when such

> failure was *not due* to physical nonavailability of gas, causes solely within the control of Seller, *regulation by governmental authority* or force majeure intervention ... (emphasis added).

Not discussing or even mentioning this clause, the court of appeals referred exclu-

6. Although this final refinement of his work did affect the total amount of Rhodes' damages esti-

mate, even counsel for the defendants concedes that these changes were "immaterial."

sively to the lack of evidence "with respect to *damages.*" 837 S.W.2d at 777 (emphasis added). Clearly, that court sustained these points only insofar as they represented an argument that there was legally insufficient evidence of damages. This interpretation is confirmed by the court's disposition: "[s]ince we have sustained the no evidence points of error *relating to the damage questions,* we reverse the judgment of the trial court and render judgment that Exxon take nothing...." 837 S.W.2d at 778 (emphasis added).

 Although the court of appeals did not reach the merits of this governmental regulations argument, we consider whether it constitutes an alternative grounds for affirming that court's judgment. The defendants contend that, because they took the quantity of gas set by Railroad Commission allowables, the clause excuses their payment for any greater amount. Such an interpretation, however, would render meaningless the more specific provisions of section four that expressly account for the role of allowables in measuring the buyer's take-or-pay obligation. Application of this particular governmental regulations provision must therefore be limited to regulatory actions *other than* Railroad Commission limits on production.

### V.

Finally, we address whether the court of appeals correctly found that the statute of limitations barred Exxon's action against Mesa as guarantor of the agreements with respect to the contract years 1983 and 1984. Mesa's alleged obligation results from its acquisition in June 1986 of Pioneer Corporation, which was WTG's guarantor under these contracts, and its express assumption of Pioneer's liabilities. Exxon does not contest that any take-or-pay liability accrued during 1983 and 1984 became due and payable in March 1984 and March 1985, respectively, but it contends the applicable four year statute of limitations [7] did not begin running on Mesa's guaranty until it assumed Pioneer's liabilities in June 1986.

Because the statute of limitations would have barred any action by Exxon against

Pioneer for the 1983 and 1984 contract years, it also bars suit against Mesa. Although Exxon cites numerous authorities for the proposition that a guaranty creates an independent obligation enforceable against the guarantor without regard to the enforceability of the underlying obligation, we need not reach this question because Mesa's promise to assume Pioneer's liabilities is not a guaranty. A guaranty is an undertaking by one party to be answerable for the payment of some debt or the performance of some contract or duty by another person, who remains liable. *Coleman Furniture Corp. v. Lieurance,* 405 S.W.2d 646, 647 (Tex.Civ.App.—Amarillo 1966, writ ref'd n.r.e.). Mesa's assumption was not a separate guaranty of the WTG contracts because Pioneer became part of Mesa rather than remaining independently liable. We therefore affirm the court of appeals holding that Exxon take nothing from Mesa for the contract years 1983 and 1984.

At oral argument counsel for Exxon contended that it had been "stripped" of a multimillion dollar jury verdict by the court of appeals. We agree that this was improper based on the grounds set forth in that court's opinion. We reverse the judgment of the court of appeals and remand the case to that court for consideration of points it did not reach that are not addressed in this opinion.

---

7. *See* Tex.Civ.Prac. & Rem.Code § 16.004(a)(3).