

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-10-00035-CV

$27,877.00 CURRENT MONEY                                        APPELLANT
OF THE UNITED STATES

V.

THE STATE OF TEXAS                                             APPELLEE

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

Appellant Brendan Scott Roberts appeals the seizure of his property pursuant to chapter 59 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. arts. 59.01–.14 (Vernon Supp. 2010). In four points, Roberts challenges the validity and constitutionality of the seizure and the factual sufficiency of the evidence supporting the trial court's conclusion that the seizure was proper. We affirm.

**Background Facts**

In March 2007, Carrollton Police Department Narcotics Officer Mai Tran received information from a confidential informant that Roberts was trafficking marihuana and alprazolam (also known as Xanax) from a house in The Colony, Texas, where Roberts lived with his girlfriend and some friends. Officer Tran obtained a search warrant from a City of Carrollton magistrate (with jurisdiction in Dallas and Denton Counties) and executed the warrant at 4249 Malone Avenue, The Colony, Texas (the Malone address), in Denton County.

At the Malone address, Carrollton police officers found 8.5 tablets of alprazolam, 2 tablets of hydrocodone, 4.48 grams of marihuana, and $4,857 in cash. Roberts was arrested.

After the arrest, Officer Tran received additional information that Roberts, fearing that the police would raid his home, had moved drugs and money to two separate places. Specifically, the information was that Roberts had moved drugs to the house of James Savoldi, a friend and alleged "runner" for Roberts, and had moved money to Roberts's parents' house. Carrollton Police Officer Jeremy Sanchez, a canine handler, and his dog, Bosko, performed a "sniff search" on Savoldi's home at 4601 Freeman Drive, The Colony, Texas (the Freeman address), in Denton County. Bosko "alerted" to an odor at the front door of the house. Based on the information from the informant and the sniff search, Officer Tran obtained a search warrant for the Freeman address.

During the execution of the warrant, Savoldi admitted to the police that he was holding the drugs for Roberts. Savoldi had hidden a black gym bag with approximately two pounds of marihuana at the Freeman address. When he heard from Roberts's girlfriend that the police had searched the Malone address, Savoldi took the bag of marihuana from his house to a hotel in Addison, Texas, where it was later confiscated by Carrollton police officers. Roberts pleaded guilty to the felony offense of possession of more than four ounces but less than five pounds of marihuana for the marihuana that the officers found in the Addison hotel room.

While in jail, Roberts made a phone call and advised an unknown person that "the money" was in a bag under his brother's bed at Roberts's parents' house, 4628 Archer Drive, The Colony, Texas (the Archer address), in Denton County. Officer Sanchez and Bosko conducted a sniff search around the exterior of the Archer address, and Bosko alerted at the bottom of the garage door. Officer Tran obtained a search warrant for the Archer address from the same magistrate in Carrollton as the previous two warrants and executed that warrant. There, the police found $23,020 under the brother's bed, in bills of various denominations, tied with hair bands. In a written statement to the police, Roberts's brother denied any knowledge or ownership of the money.

The money recovered from the Archer address was taken to the Carrollton Police Station, where Officer Sanchez conducted another sniff search. This time, he took three new paper bags and put the money in one of them. Each bag was

3

closed by folding over the top and all three bags were placed in a hallway about six feet apart. Bosko sniffed all three bags and alerted on the sack containing the money.

In April 2007, the State filed its notice of seizure and intended forfeiture, alleging, among other things, that Roberts owned the money and that it was contraband as proceeds from the sale of narcotics. Roberts denied the allegations and asserted affirmative defenses, including illegal search and seizure.

After the asset forfeiture hearing, the trial court issued forty findings of fact and four conclusions of law in which it concluded that the $23,020 seized from the Archer address "is the proceeds of Brendan Roberts's illegal drug trafficking activities," and is therefore contraband. The trial court ordered the money to be forfeited to the State under article 59.02 of the code of criminal procedure.[1] This appeal followed.

## Standard of Review

Forfeiture proceedings are civil in nature. Tex. Code Crim. Proc. Ann. art. 59.05(b) (Vernon 2006). The State must prove by a preponderance of the evidence that the property is subject to forfeiture. *Id.* Money is subject to forfeiture if it is derived from manufacturing, delivering, selling, or possessing a

---

[1] The trial court ordered the return of the $4,857 found at the Malone address because it was not listed on the search warrant return.

controlled substance. *Id*. arts. 59.01(2), 59.02(a); *State v. $11,014.00*, 820 S.W.2d 783, 784 (Tex. 1991).

In forfeiture proceedings, the State must show probable cause for seizing a person's property. Tex. Const. art. I, § 9; *$11,014.00*, 820 S.W.2d at 784. To show probable cause, the State must establish a reasonable belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute. *$11,014.00*, 820 S.W.2d at 784. This is accomplished when the State proves that it is more reasonably probable than not that the seized currency was either intended for use in, or derived from, a violation of the offenses listed in the forfeiture statute. *State v. Five Thousand Five Hundred Dollars in U.S. Currency*, 296 S.W.3d 696, 701 (Tex. App.—El Paso 2009, no pet.). The substantial connection may be proved by circumstantial evidence. *$11,014.00*, 820 S.W.2d at 785. When relying on circumstantial evidence, "the State is required to offer proof which does more than raise a mere surmise or suspicion regarding the source of money." *Antrim v. State*, 868 S.W.2d 809, 812 (Tex. App.—Austin 1993, no writ) (quoting *Money of the United States $8,500.00 v. State*, 774 S.W.2d 788, 792 (Tex. App.—Houston [14th Dist.] 1989, no writ)).

**Discussion**

**I.**

We address Roberts's second issue first, as it is arguably dispositive. *See* Tex. R. App. P. 47.1. Roberts claims the search at the Archer address was

5

unlawful because it was conducted by Carrollton police officers outside Carrollton city limits. Roberts directed the trial court to the local government code and to *State v. Kurtz*, 152 S.W.3d 72 (Tex. Crim. App. 2004), to support his argument that Carrollton police only have jurisdiction within their city limits for any action they take in their police capacity. Because the search occurred in The Colony and not in Carrollton, he contends the search was illegal. Roberts further argues that the trial court erred by applying a good-faith exception *sua sponte* and based upon insufficient evidence.

The local government code grants general-law municipalities the right to establish and regulate a municipal police force.[2] Tex. Loc. Gov't Code Ann. § 341.001(a) (Vernon 2005). Section 341.001, which is entitled "Police Force of a Type A General-Law Municipality," further states

>  (e)   A police officer has:
>
>  (1)   the powers, rights, duties, and jurisdiction granted to or imposed on a peace officer by the Code of Criminal Procedure; and
>
>  (2)   other powers and duties prescribed by the governing body.

---

[2] Although section 341.001 applies to Type A municipalities, the other two types of general-law municipalities (Type B and Type C) look to grants of power given to Type A municipalities absent law specifically applying to Type B or Type C municipalities, respectively. Tex. Loc. Gov't Code Ann. §§ 51.035, 51.051, 51.052 (Vernon 2008). Since there is no specific law regarding the jurisdiction of Type B or Type C municipal police officers to execute search warrants, the jurisdiction for all three types of general-law municipalities is that which is granted to Type A municipalities. *Id*. §§ 51.035, 51.051, 51.052.

6

(f) A police officer may serve in each county in which the municipality is located all process issued by a municipal court.

*Id*. Section 341.003 is entitled "Police Force of a Home-Rule Municipality" and says only that "[a] home-rule municipality may provide for a police department." *Id*. § 341.003. Roberts argues that because the local government code specifically grants general-law municipal police departments countywide jurisdiction, but does not similarly grant it to home-rule municipalities, home-rule police departments must therefore have only citywide jurisdiction.

Home-rule municipalities are different from general-law municipalities because a "home rule city derives its power not from the Legislature but from Article XI, Section 5, of the Texas Constitution." *Lower Colo. River Auth. v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex. 1975); *see also* Tex. Const. art. XI, § 5. They possess "the full power of self government and look to the Legislature not for grants of power, but only for limitations on their power." *Dallas Merchs.' & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490–91 (Tex. 1993). A home-rule municipality's powers may therefore be limited by statute, but only when the legislature's intention to do so appears "with unmistakable clarity." *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998).

The reason that section 341.003 does not grant home-rule police countywide jurisdiction is because home-rule municipalities do not receive their grants of power from the legislature. *See Lower Colo. River Auth.*, 523 S.W.2d at 643. General-law municipalities, on the other hand, do. *See Tex. Dep't of*

7

*Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004) ("General-law municipalities . . . are political subdivisions created by the State and, as such, possess those powers and privileges that the State expressly confers upon them."). We do not see in local government code sections 341.001 or 341.003, or in any other statute, any clear intent by the legislature to restrict a home-rule municipality police force to a jurisdiction any less than that of a general-law municipality.

In *Britt v. State*, 768 S.W.2d 514, 515 (Tex. App.—Fort Worth 1989, no pet.), we held that police officers of the City of Arlington had countywide jurisdiction to execute search warrants. Arlington is a home-rule municipality. *See* The Charter of the City of Arlington Texas, http://www.arlingtontx.gov/citycharter/index.html (last visited Nov. 29, 2010). Roberts argues that amendments enacted to the local government code in 1995 superseded *Britt*. *See* Act of June 16, 1995, 74th Leg., R.S., ch. 829, secs. 2–3 (amended 1995) (current version at Tex. Loc. Gov't Code Ann. §§ 341.001–021 (Vernon 2005)). However, in *Brother v. State*, 85 S.W.3d 377, 385 (Tex. App.—Fort Worth, 2002), *aff'd* 166 S.W.3d 255 (Tex. Crim. App. 2005), we addressed the effects of the 1995 amendments on the jurisdiction of police officers. *See* Tex. Loc. Gov't Code Ann. § 341.001. We noted that the former government code sections linked the jurisdiction of general-law municipal police officers to the jurisdiction of the sheriff, which was specified in the code of criminal procedure to be countywide. *Id*. at 383; *see also* Tex. Code Crim. Proc. Ann. art. 2.17 (Vernon

8

1977). The 1995 amendments to the statutes eliminated the language that defined the geographic scope of city police officers' jurisdiction. However, we concluded that the legislative history indicated no intent to shrink police officers' jurisdiction. *Id*. at 384 ("To the contrary, the House Research Organization bill analysis explained that the purpose of the legislation was to broaden city police officers' authority . . . ."). *Brother* supports our belief that *Britt* is still good law and the jurisdiction for home-rule municipal police officers to execute search warrants remains county-wide.

*Kurtz*, which Roberts cites in support of a citywide limitation on jurisdiction, is inapplicable to the present case. *Kurtz* addresses the jurisdiction of officers making arrests without a warrant. 152 S.W.3d at 75–76. Prior to the enactment of a statute that specifically and clearly limited the jurisdiction of certain peace officers, including home-rule police forces, jurisdiction for warrantless arrests was countywide. *Id*. The 1995 act restricted that jurisdiction. *Id*.; *see also* Tex. Code Crim Proc. Ann. art. 14.03 (Vernon Supp. 2010); Act of June 16, 1995, 74th Leg., R.S., ch. 829, sec. 1, (amended 1995) (current version at Tex. Code Crim. Proc. Ann. Art 14.03). Roberts has not argued that there is any act that has likewise limited the jurisdiction of officers in regards to search warrants.

Further, it is the duty of every peace officer, when a search warrant is duly delivered to him, to "execute it without delay." Tex. Code Crim. Proc. Ann. art. 18.06 (Vernon 2005). A search warrant is sufficient if it "command[s] any peace officer of the proper county to search forthwith the person, place, or thing

9

named." *Id*. art. 18.04. The search warrants in this case command "the Sheriff or any Peace Officer of DENTON County, Texas or any Peace Officer of the State of Texas." City police officers are "peace officers" as defined by the code of criminal procedure article 2.12(3). *Id*. art. 2.12(3) (Vernon 2005). The penal code does not define the phrase "of the county" or "of the State of Texas," but since a warrant must command a peace officer "of the proper county," we take "Peace Officer of DENTON County" to mean a peace officer with jurisdiction throughout Denton County. Because the search warrant was issued in Carrollton, in Denton County, by a magistrate with jurisdiction in Denton County, to Carrollton police officers with jurisdiction in Denton County, the Carrollton police officers acted within their duty to accept the search warrants and execute them.

We hold that a home-rule municipal police force's jurisdiction for the execution of a valid search warrant is at least as broad as that of a general-law municipality, that is, at least countywide. *See Brother*, 85 S.W.3d at 385 (holding the jurisdiction of a type A municipality police officer is "at least county-wide"). Such a holding is not inconsistent with the constitution, the general laws, nor the city's charter. *See Proctor*, 972 S.W.2d at 733 ("[A] home rule city . . . has all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter.").

As it is undisputed that Carrollton is located in the county in which the search warrant was issued and in which the search took place, the execution of

the search warrant by Carrollton police officers on the Archer address in The Colony was lawful. As it was a lawful search, we need not address Roberts's good-faith-exception argument. We overrule Roberts's second point of error.

**II.**

In his first point, Roberts complains that the trial court's determination that the money was contraband was not based on factually sufficient evidence.

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g) *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

At trial, it was the State's burden to establish, by a preponderance of the evidence, a substantial nexus or connection between the property to be forfeited and the statutorily defined criminal activity, which it may do by circumstantial evidence. *$11,014.00*, 820 S.W.2d at 785. That is, the State must show that it must be more reasonable than not that the money was derived from the sale of controlled substances. *$9,050.00 in U.S. Currency v. State*, 874 S.W.2d 158, 161 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

The trial court made the following relevant findings of fact regarding the $23,020:

7.    Carrollton P.D. received . . . information that Mr. Roberts had removed the marijuana and money from [the Malone address] and was hiding the marijuana and additional proceed money in two separate places to avoid said items from being seized by police.

. . . .

10.    Carrollton P.D. received additional information that Mr. Roberts's drug money was possibly at [the Archer address]. . . .

. . . .

12.    K-9 Bosko alerted at . . . the garage door at the Archer address.

. . . .

22.    At the Archer address, Carrollton P.D. officers located a black bag under the bed of Benjamin Roberts, brother of Brendan Roberts.

23.    The black bag contained several rolls of U.S. currency wrapped with hair ties.

12

24.   Benjamin Roberts provided a written statement to police that the money did not belong to him and that he did not know said bag of money was under his bed.

25.   $23,020.00 was recovered from the black bag.

. . . .

27.   At the police station, K-9 Officer Sanchez used K-9 Bosko to conduct an open air sniff on the $23,020.00.

. . . .

31.   K-9 Bosko only alerted on the bag containing the U.S. currency which indicated that the money contained an odor of marijuana or some other illegal substance which Bosko is trained to detect.

32.   The marijuana which Brendan Roberts gave to James Savoldi and which was recovered from the hotel weighed 2.20 pounds.  The street value of two pounds of marijuana is approximately $7,000.

. . . .

34.   Carrollton P.D. conducted an employment history investigation through the Texas Workforce Commission which revealed that Brendan Roberts had not worked since 2001.

. . . .

37.   On October 16, 2007, in F-2007-1267-A in the 16th District Court of Denton County, Texas, Brendan Roberts plead guilty to the marijuana he gave James Savoldi and was convicted of the instant State Jail Felony Offense of Possession of Marijuana Greater than Four Ounces and Less than Five Pounds and sentenced to 180 days in jail. [3]

---

[3]Roberts also argues that some of the findings of fact entered by the trial court are not supported by the record.  In his brief, Roberts did not identify which findings were not supported by the evidence, but in an appendix, he did highlight findings (among others not transcribed above) 24 and 34.  These findings are founded upon information in the affidavits supporting the search warrants, but the court stated it would not take judicial notice of the facts contained in those

13

The undisputed evidence showed that Roberts had been unemployed for six years. There was no evidence of a legitimate job or any other legal source of income. $23,020 is a large amount of cash for anyone to possess, and it is particularly notable that it was found in various denominations in a bag tied with hair bands. No one else claimed ownership of the money, including Roberts's brother in whose room it was found. In fact, Roberts's brother specifically disclaimed any knowledge or ownership of the money.

Roberts pleaded guilty to possession of marihuana for the drugs he had given James Savoldi to hide. Roberts hid that marihuana when he thought his house might be raided. At that same time, he hid the money in question. Roberts's criminal history also included a 2000 felony conviction for manufacture and delivery of a controlled substance. Roberts also did not argue that the drugs and the money at the Malone address were not his. Roberts's own statements in a phone call from jail alerted the authorities that he had hidden money. While the

affidavits. However, additional bases for each finding complained of can be found in Roberts's own evidence. Roberts offered in evidence the State's responses to Roberts's requests for disclosures, which included an affidavit by Officer Tran. Roberts did not request a limitation to their admission. *See Poindexter v. State*, 153 S.W.3d 402, 407–409 (Tex. Crim. App. 2005) (holding that all evidence submitted without objection or limiting request was offered to prove appellant's guilt). Out-of-court statements that are admitted into evidence without objection or request for admission for a limited purpose can be considered in determining if there was an affirmative link between the money and the criminal behavior. *See id.* at 409 ("The out-of-court statements of the C.I. have sufficient probative value, in and of themselves, to establish an affirmative link between appellant and the crack cocaine found in his home."). Further, Roberts admits there is live testimony supporting finding 24.

14

money and the drugs in this case were not found in close proximity to each other, the evidence is more than adequate to show that Roberts made a conscious effort to hide the two in different locations. Further, there was a positive alert by the narcotic-detecting canine on the money after it was recovered.

Considering all the evidence in this case, we cannot say that the foregoing evidence is so weak or the evidence to the contrary is so overwhelming that the judgment should be set aside. *See Garza*, 395 S.W.2d at 823. Accordingly, we hold that the evidence is factually sufficient to support the trial court's determination and we overrule Roberts's first point.

**III.**

In his third point, Roberts complains of the admission of expert testimony by Officer Sanchez, the Carrollton police officer who conducted the dog sniff searches on the Freeman and Archer addresses and on the money at issue. At the hearing, Roberts objected to Officer Sanchez's testimony because the State "failed to give [him] any opinion, any certification, or any other information" and complained that the State did nothing more than "simply just name him as an expert." On appeal, Roberts complains that the State failed to provide a complete response to his requests for disclosure. When Roberts objected at the trial, the judge asked if any objection or motion to compel had been filed. Roberts answered no and the court overruled the objection. Roberts argues that the trial judge abused his discretion by applying the wrong standard. Roberts does not specify what the State failed to provide, but it appears that he complains

15

that he was not given the requested mental impressions and opinions of Officer Sanchez.

The rule requiring disclosure of the expert's testimony before trial is intended "to provide adequate information about the expert's opinions to allow the opposing party the necessary information to prepare to cross-examine the expert and to rebut this testimony with its own experts." *Elhamad v. Quality Oil Trucking Serv., Inc.*, No. 02-02-00412-CV, 2003 WL 22211543, at *6 (Tex. App.—Fort Worth Sept. 25, 2003, no pet.) (mem. op.) (citing *Exxon Corp. v. W. Tex. Gathering Co.,* 868 S.W.2d 299, 304 (Tex. 1993)). When a party responds to a written discovery request, the party must "make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made." Tex. R. Civ. P. 193.1. Failure to provide a response to a request for disclosure results in the automatic exclusion of the witness's testimony, unless the trial court finds good cause or lack of surprise or prejudice. Tex. R. Civ. P. 193.6; *VingCard, A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 856 (Tex. App.—Fort Worth 2001, no pet.).

The admission or exclusion of evidence is within the trial court's sound discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Id*. In determining whether there was an abuse of discretion, we must ascertain whether the trial court's finding served the purpose of thwarting "[legal]

16

gamesmanship and trial by ambush." *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 852 (Tex. App.—Fort Worth 1990, writ denied).

Pursuant to Texas Rule of Civil Procedure 194.2, Roberts properly requested that the State disclose, for all testifying experts:

(1)    The expert's name, address and telephone number;

(2)    The subject matter on which the expert will testify;

(3)    The general substance of the expert's impressions and opinions and a brief summary of the basis for them; and

(4)    All documents, tangible things, reports, models or data compilations that have been provided to, reviewed by or prepared by or for the expert in anticipation of the expert's testimony.

Tex. R. Civ. P. 194.2.

As to Officer Sanchez, the State responded, "Officer [Sanchez][4] is one of the investigating officers, and will provide testimony regarding the detection of contraband, and the nexus connecting the *res* to the illegal activity." The State further identified all the designated police officers as "experts in the field of law enforcement, including but not limited to, the detection of illegal activity, to wit: drug detection, interdiction and possession. As such, they will provide testimony regarding the detection of contraband, and the nexus connecting the *res* to the illegal activity." The State also attached an affidavit by Officer Tran, in which she

---

[4]The State's response to Roberts's first request for disclosure incorrectly refers to Officer Sanchez as "Officer Putnam" in this one sentence. This appears to be a "cut-and-paste" typo. Both Officer Sanchez and K-9 Bosko are correctly identified directly above the sentence. While Roberts draws attention to the typo in his brief, he does not seem to argue that it caused any confusion about who was identified as an expert, or as to what each expert would testify.

described in detail the open-air sniffs conducted by Officer Sanchez and his K-9 Bosko on the Freeman and Archer addresses and the sniff conducted by Officer Sanchez and Bosko on the currency at the Carrollton Police Department, and noted that "K-9 Bosko is trained and certified to detect and alert to the presence of the odors of Marijuana, Methamphetamine, Cocaine, Heroin, and their derivatives."

We have said before that failure to respond to a request for the mental impressions and opinions of the expert is a complete failure to respond, triggering the automatic exclusion under Rule 193.6, *VingCard*, 59 S.W.3d at 856, not just an incomplete answer, which the Texas Supreme Court has held requires a pretrial objection or a pretrial motion to compel or for sanctions, *State Farm Fire & Cas. Co. v. Morua*, 979 S.W.2d 616, 619–620 (Tex. 1998). In *VingCard*, plaintiff Merrimac identified an expert who would provide an opinion projecting future sales and damage to Merrimac's reputation caused by defendant VingCard. 59 S.W.3d at 854. VingCard objected at trial that Merrimac failed to disclose the expert's mental impressions and opinions and their bases. *Id*. at 855. Because Merrimac wholly failed to inform VingCard how its expert arrived at his projections, VingCard was unable to prepare to cross-examine the witness at trial. *Id*. at 856.

Unlike *VingCard*, the State in this case did inform Roberts of the opinions of Officer Sanchez, and the bases thereof. Here, the State disclosed that Officer Sanchez would testify to "the detection of contraband, and the nexus connecting

18

the *res* to the illegal activity." The State attached to its response to Roberts's requests for disclosure Officer Tran's affidavit. The affidavit stated that Officer Sanchez's K-9 partner was "trained and certified" in drug detection and described the three sniffs conducted. It detailed the open air sniffs of both the houses on Archer and Freeman as well as the procedure in the hallway of the police department. The affidavit described how Officer Sanchez used Bosko to conduct a sniff on the seized currency and that the K-9 alerted only to the bag containing the money. At trial, this is what Officer Sanchez testified to. We cannot say that the State completely failed to respond to Roberts's requests for disclosure. Nor can we say that Roberts was surprised or prejudiced by Officer Sanchez's testimony. The testimony was within the subject matter that the State declared, and the sniff procedures were described at trial just as they were in Officer Tran's affidavit. Thus, Roberts was sufficiently informed so that he could prepare for meaningful cross-examination of the State's expert witness.

The trial judge did not abuse his discretion by overruling Roberts's objection. We overrule Roberts's third point.

## IV.

Roberts argues that the forfeiture of the $23,020 is an unconstitutionally excessive fine under the Eighth Amendment. For the reasons stated below, we disagree.

The Eighth Amendment prohibits the imposition of excessive fines. U.S. Const. amend. VIII. The United States Supreme Court has determined that the

19

Eighth Amendment applies to forfeitures "if they constitute punishment for an offense." *United States v. Bajakajian*, 524 U.S. 321, 328, 118 S. Ct. 2028, 2033 (1998). Whether the forfeiture of drug proceeds is subject to the Eighth Amendment is unsettled in Texas. *Compare U.S. v. Betancourt*, 422 F.3d 240, 250 (5th Cir. 2005) (stating that after *Bajakajian* the Eighth Amendment still does not apply to the forfeiture of drug proceeds) *with One Car, 1996 Dodge X-Cab Truck v. State*, 122 S.W.3d 422, 427 (Tex. App.—Beaumont 2003, no pet.) (applying the Eighth Amendment to article 59.02 forfeitures); *see also* Tex. Code Crim. Proc. Ann. art. 59.05(e) (Vernon 2006) ("It is the intention of the legislature that asset forfeiture is remedial in nature and not a form of punishment.").

Assuming without deciding that forfeiture of the $23,020 is subject to the Eighth Amendment's excessive fines clause, and under the analysis set forth in *Bajakajian*, we do not believe the forfeiture in this case to be unconstitutionally excessive. Roberts's offense is a serious one involving illegal drugs. The offense occurred in the context of other alleged illegal activities, including possession of other illegal substances.[5] The information provided by the informant was that Roberts was trafficking drugs and the evidence in this case showed that Roberts was knowledgeable enough of police investigations of drug dealers to move his drugs and money to separate locations for hiding. The civil forfeiture statute unquestionably targets drug traffickers. *See* Tex. Health &

---

[5]Roberts was charged with misdemeanor possession of a controlled substance for the alprazolam found at the Malone address. The charge was dismissed after Roberts agreed to plead guilty to the possession of marihuana.

20

Safety Code Ann. § 481.112(b) (Vernon 2010); Tex. Code Crim. Proc. Ann. arts. 59.01(2)(B)(i), 59.02(a) (Vernon Supp. 2010). The evidence in this case demonstrated that Roberts had no other source of income and that the extent of his criminal activity went beyond mere possession of marihuana. The marihuana had a street value of $7,000, drug trafficking is known to correlate with violence, *see 1992 BMW v. State*, No. 04-07-00116-CV, 2007 WL 2608364, at *2 (Tex. App.—San Antonio Sept. 12, 2007, no pet.) (mem. op.) (quoting *Thomas v. State*, 916 S.W.2d 578, 583 (Tex. App.—San Antonio 1996, no writ)) ("Studies clearly demonstrate the direct nexus between illegal drugs and crimes of violence."), and the trial court expressed concern that there was "$27,877.00 worth of harm" to the State. So the seriousness of Roberts's criminal activity and the destructive effects of drugs on today's society weigh heavily in analyzing proportionality.

Roberts's offense was a state jail felony with a maximum of two years' imprisonment and a fine not to exceed $10,000. Tex. Penal Code Ann. § 12.35(a), (b) (Vernon 2003). Thus, the proceeds to be forfeited are roughly 2.3 times the maximum statutory fine. Courts have held that a forfeiture of twice the maximum fine is not grossly disproportionate. *See, e.g., U.S. v. Wallace*, 389 F.3d 483, 486 (5th Cir. 2004) (upholding forfeiture of $30,000 airplane when the statutory maximum fine for failure to register the airplane was $15,000). In light of the gravity of Roberts's offense, we do not find the forfeiture of $23,020 grossly disproportionate. We overrule Roberts's fourth point of error.

21

**Conclusion**

Having overruled all of Roberts's points, we affirm the trial court's judgment.

                                              LEE GABRIEL
                                              JUSTICE

PANEL:  DAUPHINOT, WALKER, and GABRIEL, JJ.

DAUPHINOT, J., filed a concurring and dissenting opinion.

DELIVERED:  December 23, 2010



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00035-CV

$27,877.00 CURRENT MONEY OF                                    APPELLANT
THE UNITED STATES

V.

THE STATE OF TEXAS                                            APPELLEE

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## CONCURRING AND DISSENTING OPINION

----------

I agree with the majority that the seizure of the property was proper. I cannot agree, however, with the majority's acceptance of Bosko's amazing abilities and expertise.

Regarding the search of Savoldi's house, the majority, in its thorough and otherwise scholarly opinion, treats Bosko's "sniff search hit" on the front door of a drug runner's house as evidence that Roberts's marijuana, as opposed to all other drugs in the world, was inside the drug runner's house. Of course, the

record makes clear that the marijuana was not in the house, despite Bosko's "hit."

Regarding the search of Roberts's parents' house and the nexus between Roberts and the money found underneath his brother's bed, Bosko conducted a sniff search and alerted at the bottom of the garage door. Somehow, that was evidence below and accepted as evidence by the majority that cash was located underneath a bed inside the house. The connection between a hit for drugs at the bottom of a garage door and money underneath a bed inside the house escapes me.

After the police seized the money from underneath the bed, it was taken, presumably, in a police unit that had transported drugs and drug users in the past—if police testimony of all the drugs found hidden behind the back seats of police units is to be believed—to the Carrollton police station, where Officer Sanchez put the money in one of three brand new paper bags. Again, one wonders how many drugs and drug users had been brought into the Carrollton police station before the cash in question arrived and how thoroughly either the police station or the police car was cleaned between seizures.

Miraculously, the Amazing Bosko alerted on the sack containing the money. Apparently, Bosko had solved the case and provided Officer Sanchez the provenance of the money. Bosko "proved" to the police that Roberts owned the money and that it was contraband as proceeds from the sale of narcotics.

The Texas Court of Criminal Appeals has recently dealt with the issue of dog-sniff lineups in *Winfrey v. State*.[1]  In that case, a man named Burr was found murdered in his home.  As the *Winfrey* court noted in the opinion,

> Investigators collected a variety of forensic evidence from the crime scene including: a partial bloody fingerprint, a bloody shoe print, and several hair samples.  Neither the prints nor the hair samples matched appellant.  Investigators were able to obtain a DNA profile from evidence at the crime scene, however, the profile excluded appellant and his family members.[2]

The police, though, received a jailhouse tip that Winfrey had told his cellmate that he had heard some things about the murder, how it was committed, and what had been stolen.  The *Winfrey* court then described the following procedure:

> To assist in the investigation, Texas Ranger Grover Huff contacted Deputy Keith Pikett, a dog handler with the Fort Bend County Sheriff's office.  Deputy Pikett testified about a "scent lineup" that he conducted nearly three years after the murder in August 2007.  He used his three bloodhounds, Quincy, James Bond, and Clue.  This involved obtaining scent samples from clothing that the victim was wearing at the time of his death and from six white males, including [Winfrey].  The dogs were "pre-scented" on the scent samples obtained from the victim's clothing.  The dogs then walked a line of paint cans containing the scent samples of the six white males.  All three dogs alerted on the can containing [Winfrey's] scent sample.
>
> Based on this, Deputy Pikett concluded that [Winfrey's] scent was on the victim's clothing. Deputy Pikett testified on cross-examination that an alert only establishes some relationship between the scent and objects and that scent detection does not necessarily indicate person-to-person contact.  Deputy Pikett also

---

[1] 323 S.W.3d 875 (Tex. Crim. App. 2010).

[2] *Id.* at 876.

3

testified on cross-examination that his understanding of the law was that convicting a person solely on a dog scent is illegal.[3]

The *Winfrey* court then discussed the validity of the science of dog sniffing:

> . . . [T]he science underlying canine-scent lineups has been questioned; thus, we think it proper to briefly address the issue. Law-enforcement personnel have long utilized canines in crime management. For example, dogs have been employed for detecting narcotics and explosives, for tracking trails, in search-and-rescue operations, for locating cadavers, and for discriminating between scents for identification purposes. In thousands of cases, canines and their handlers have performed with distinction. Despite this success, we acknowledge the invariable truth espoused by Justice Souter that "[t]he infallible dog, however, is a creature of legal fiction."

> This case pertains to canines used to discriminate among human scents in order to identify a specific person in a lineup. This process is often referred to as human-scent discrimination. Some courts, including the Fourteenth Court of Appeals, have determined that for purposes of admissibility, "there is little distinction between a scent lineup and a situation where a dog is required to track an individual's scent over an area traversed by multiple persons." Other courts, such as the Supreme Court of Florida, have distinguished scent lineups from dog tracking.

> Cases involving the use of dogs, usually bloodhounds, to track humans are abundant and the law is well settled in regards to admissibility of such evidence with only a minority of courts outright rejecting bloodhound evidence. Fewer courts have addressed the question of whether dog evidence is sufficient to sustain a conviction when it is the only evidence. However, as early as 1913, our colleagues at the Supreme Court of Mississippi held . . . dog tracking evidence, alone and unsupported, to be insufficient to affirm a conviction. And as recently as 1983, the Supreme Court of Washington agreed. In fact, our research suggests the courts that have passed on this issue have concluded that dog-scent evidence, when admissible, is insufficient, standing alone, to sustain a conviction.

---

[3]*Id.* at 877–78 (citations omitted).

Like our sister courts across the country, we now hold . . . scent-discrimination lineups, whether conducted with individuals or inanimate objects, to be separate and distinct from dog-scent tracking evidence. "Even the briefest review of the scientific principles underlying dog scenting reveals that, contrary to the conclusions of many courts, there are significant scientific differences among the various uses of scenting: tracking, narcotics detection, and scent lineups." The FBI agrees, noting that tracking canines use human scent *and* environmental cues to locate the track of an individual. Accordingly, we conclude that scent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction. Like the Supreme Court of Washington, we believe that "[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence." To the extent that lower-court opinions suggest otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive.[4]

As I understand the *Winfrey* court, a dog may be able to detect a scent, but not how or when the scent was placed on a person or on an inanimate object. With all appropriate respect to Bosko, the fact that he hit on a drug runner's front door proves nothing, other than that at some time drugs or an object that had contacted drugs or a person or animal using drugs was at the front door. The hit does nothing to connect Roberts with the drugs not found in the house. Similarly, the fact that Bosko hit on the garage door of Roberts's parents' house proves nothing, other than that at some time drugs, even prescription drugs, or a person or animal using drugs was at the garage door. The fact that Bosko hit on the cash found under Roberts's brother's bed means only that at some time, before or after the cash left the mint, somebody smoked a drug or controlled substance

---

[4]*Id.* at 882–84 (citations omitted).

in the vicinity of the cash, or used one or more of the bills to sniff a drug or a controlled substance or to package a drug or controlled substance, or had the cash in the vicinity of a drug lab, or in some other manner caused at least one bill to come close enough to a drug or a controlled substance to pick up the scent. Scientists report that as much as ninety percent of our paper money contains traces of cocaine.[5]  Even Bosko could not tell his handlers whether the areas he alerted on "contained an odor of marijuana" or whether they contained an odor of "some other illegal substance which Bosko is trained to detect."

I also agree that the trial court did not abuse its discretion by overruling Roberts's objection to Officer Sanchez's testimony on the ground that he was not disclosed as an expert.  My reason for agreeing, however, is that I cannot agree that Officer Sanchez is an expert.  Had Roberts objected on the basis that any attempt to use Bosko to connect the cash or the physical locations to Roberts was junk science, we would have a different question before us.

The testimony regarding Bosko's hits is no evidence of Roberts's guilt, and I would so hold.  I would also hold that none of Bosko's hits justified any of the searches.  And were the testimony regarding Bosko's hits the only evidence of Roberts's guilt, I would not concur in the result.  But if we exclude testimony

---

[5]Madison Park, 90 Percent of U.S. Bills Carry Traces of Cocaine (Aug. 14, 2009), http//articles.cnn.com/2009-08-14/health/cocaine.traces.money_1_ cocaine-dollar-bills-paper-bills?_s=PM:HEALTH (last visited December 21, 2010).

regarding Bosko's hits, the evidence remains sufficient to support the trial court's determination under the appropriate standard of proof.

For these reasons, I respectfully dissent from the majority's deference to the explanation of Bosko's actions and the imputation of Bosko's conclusions but concur in the disposition of this appeal.

LEE ANN DAUPHINOT
JUSTICE

DELIVERED: December 23, 2010