

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00090-CV

FORTY-FIVE THOUSAND FOUR HUNDRED
EIGHTY DOLLARS U. S. CURRENCY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 76th District Court
Titus County, Texas
Trial Court No. 35,593

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

## MEMORANDUM OPINION

Laron Wren, the driver of an automobile from which the State confiscated $45,480.00, appeals from a judgment ordering the cash to be forfeited to the State as contraband. Wren bases his argument on two points: (1) that the money was discovered in the automobile he was driving as the result of an unlawful search and (2) that the State entirely failed to prove any substantial connection between the cash which was found and any illicit activities.

The evidence shows that Wren (an Illinois resident) was driving west on Interstate Highway 30 (I-30) through Titus County when the automobile was observed by Trooper Chuck Cannon of the Texas Department of Public Safety. Cannon testified that the conduct which drew his attention to the car was that although the automobile was traveling at highway speeds, it was maintaining a distance within only a car length between it and the automobile it was following, a distance which Cannon believed violated safety concerns.

Cannon (who had noticed that the car driven by Wren bore Indiana license plates) pulled the car over and had Wren come sit in the front seat of the patrol car as Wren was questioned. Cannon indicated that at that time, it was his intention to simply write Wren a warning ticket. However, as Cannon conversed with Wren while preparing the warning ticket, his suspicions became aroused and he asked Wren for permission to search the car Wren was driving. When Wren refused that permission, Cannon requested a drug dog to be brought to sniff the car. The dog and handler arrived an undisclosed length of time later,[1] and the dog handler testified that the dog alerted on the seams of the car doors. (From the video recording, it appears that this

---

[1]Apparently, no inordinate amount of time expired before the drug dog came to the scene because Wren makes no complaint on appeal of an unreasonable detention time in waiting for the dog.

occurred in a moment of silence during the drug dog's barking contest with the dog in the car.) Using the drug dog's alert as probable cause, a detailed search of the entire car was made, but the search did not result in the discovery of any drugs. Rather, the officers located a small cardboard box in the trunk of the car that contained the $45,480.00 which is the subject of this suit.[2] Because Wren was not found in possession of any illicit drugs (either on his person or in the car), no charges were filed against him. However, the officers characterized the money as contraband, TEX. CODE CRIM. PROC. ANN. art. 59.01 (West Supp. 2012), and seized it, TEX. CODE CRIM. PROC. ANN. art. 59.02 (West Supp. 2012).

Although there was some speculation at trial that the dog may have detected the scent of drugs on the money, there was no proof given to support that position. No test was conducted to determine if the dog would alert on the money, and the area of the car where the dog alerted was in the middle of the car, not in the trunk where the money was discovered.

The fact that the alert by the drug dog was concentrated on the center of the passenger compartment of the car but the search was extended to the trunk might give rise to some concern about extension of the search area from the cabin of the car to its trunk. The United States Supreme Court has held, "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982); *Blaylock v. State*, 125 S.W.3d 702, 705 (Tex. App.—Texarkana 2003, pet. ref'd). At one time, the Texas Court of Criminal Appeals

---

[2]The officers made much of the fact that the cash was hidden and the bills held together with rubber bands. Despite their comments, any person carrying over $45,000.00 in cash would be well served to hide it as thoroughly as possible, and the use of rubber bands to keep money from blowing away is hardly unique to the drug trade. Neither of those factors makes it any more likely that the money is related to the drug trade.

3

made a distinction between the existence of probable cause to search the passenger compartment and probable cause to search the trunk. *See Gill v. State*, 625 S.W.2d 307, 310 (Tex. Crim. App. [Panel Op.] 1980), *overruled by Osban v. State*, 726 S.W.2d 107, 110 (Tex. Crim. App. 1986) (overruling *Gill* irrespective of *Ross* but noting that *Ross* authorizes search of entire car provided object being searched for could be found in area searched), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 685 (Tex. Crim. App. 1991) (noting Texas Constitution may afford greater protection than federal but declining to decide and leaving rest of *Osban* undisturbed). Texas courts no longer recognize this distinction. *Osban*, 726 S.W.2d at 110; *Parks v. State*, 858 S.W.2d 623 (Tex. App.—Fort Worth 1993, pet. ref'd) (informant's tip gave probable cause to search entire car).

The evidence also shows that before the drug dog was called in, the officer saw on the rental agreement that it had been rented by a third party (according to Wren, his girlfriend) and that even though the car was overdue to be returned in Indiana, its direction was toward Dallas and not toward the specified return site.

Further, when Wren was asked about past criminal charges, he mentioned that he had been convicted of murder but made no mention of subsequent drug-related charges. Cannon repeatedly recited the "totality of the circumstances" as giving rise to his suspicions.

**Standard of Review**

The State may pursue the forfeiture of funds that constitute proceeds from illegal drug trafficking. *See* TEX. CODE CRIM. PROC. ANN. arts. 59.01–.14 (West 2006 & Supp. 2012). To entitle itself to the forfeiture of the cash, the State must prove by a preponderance of the evidence

that the cash is contraband. Contraband is defined as property used or intended to be used in the commission of certain felonies or proceeds derived from those felonies. TEX. CODE CRIM. PROC. ANN. art. 59.01(2)(A)–(D); *State v. Silver Chevrolet Pickup*, 140 S.W.3d 691, 692 (Tex. 2004) (per curiam). As relevant to this case, contraband is money that is derived from or intended for use in manufacturing, delivering, selling, or possessing a controlled substance. TEX. CODE CRIM. PROC. ANN. arts. 59.01–.02; *$24,156.00 in U.S. Currency v. State*, 247 S.W.3d 739, 743 (Tex. App.—Texarkana 2008, no pet.); *$27,920.00 in U.S. Currency v. State*, 37 S.W.3d 533, 535 (Tex. App.—Texarkana 2001, pet. denied).

**Sufficiency of the Evidence to Support Forfeiture**

Although courts reason that defenses and explanations provided by the defendant are useful tools for analysis, the burden of proof remains on the State to prove the funds were contraband. It is not a burden placed on the owner to prove the source or purpose of the funds.

**Excessive Stop**

We assume, as do both parties, that the exclusionary rule common in criminal cases applies to civil forfeiture proceedings.[3] The Texas Supreme Court has yet to decide this issue.

---

[3]After carefully reviewing the arguments made, we conclude that the issue is grounded on basic exclusionary principles rather than the question of whether probable cause existed to seize the money. Although Chapter 59 specifies no additional evidentiary requirements for forfeiture beyond proof that the property is contraband, the Texas Supreme Court has held that the State must also show the existence of probable cause for seizing a person's property. *State v. $11,014.00*, 820 S.W.2d 783, 784 (Tex. 1991) (per curiam); *Fifty-Six Thousand Seven Hundred Dollars in U.S. Currency v. State*, 730 S.W.2d 659, 661 (Tex. 1987). "Probable cause in the context of forfeiture statutes is a reasonable belief that 'a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute.'" *Fifty-Six Thousand Seven Hundred Dollars in U.S. Currency*, 730 S.W.2d at 661 (quoting *United States v. $364,960.00 in U.S. Currency*, 661 F.2d 319, 323 (5th Cir.1981)); *see State v. Thirty Thousand Six Hundred Sixty Dollars & no/100*, 136 S.W.3d 392, 407 (Tex. App.—Corpus Christi 2004, pet. denied).

*See State v. $217,590.00 in United States Currency*, 18 S.W.3d 631, 632 (Tex. 2000).[4] Traditionally, the exclusionary rule has applied to civil forfeiture proceedings in which an item is forfeited because of its use in carrying out criminal activity, *see One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699–702 (1965), and this Court has assumed, without deciding, that the rule applies. *Four Thousand One Hundred Eighty-Two Dollars in United States Currency v. State*, 944 S.W.2d 24, 27 (Tex. App.—Texarkana 1997, no writ); *see also Fifty-Six Thousand, Seven Hundred Dollars in United States Currency v. State*, 710 S.W.2d 65, 70 (Tex. App.—El Paso 1986) (indicating exclusionary rule would apply unless "the deterrent effect may be satisfied by other means, thereby leaving no reason to exclude the evidence in a civil action"), *rev'd on other grounds*, 730 S.W.2d 659 (Tex. 1987); *State v. Five Thousand Five Hundred Dollars in United States Currency*, 296 S.W.3d 696, 701 n.2 (Tex. App.—El Paso 2009, no pet.).

Wren first contends that the State failed in its burden to prove that it had a proper basis for the stop and search. He correctly acknowledges that an observed violation of traffic laws justifies a stop. *See Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992); *Williams v. State*, 356 S.W.3d 508, 524–55 (Tex. App.—Texarkana 2011, pet. ref'd). The officer testified that Wren was driving at freeway speed within a car length of the automobile in front of him. There is no evidence to the contrary. That fact is sufficient to justify the initial stop.

The question then becomes whether police had sufficient reasonable suspicion to justify a continued detention of Wren after the reason for that stop (a warning ticket for following too closely) had been completed. A search which is reasonable at its inception may violate the

---

[4]Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment shall not be admitted against the accused. U.S. CONST. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643 (1961).

Fourth Amendment by virtue of its intolerable intensity and scope. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). An investigative detention must also be temporary and last no longer than is necessary to effectuate the initial purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Cisneros v. State*, 165 S.W.3d 853, 859 (Tex. App.—Texarkana 2005, no pet.). In a traffic stop, the police may ask for identification, a valid driver's license, proof of insurance, and may check for outstanding warrants. *Cisneros*, 165 S.W.3d at 859.

Once the purpose of the initial detention has been investigated, any continued detention must be based on specific, articulable facts which, taken together with rational inferences from those facts, "would warrant a person of reasonable caution in the belief that a continued detention was justified, i.e., the detainee was or would soon be engaged in criminal activity." *Herrera v. State*, 80 S.W.3d 283, 288 (Tex. App.—Texarkana 2002, pet. ref'd); *Simpson v. State*, 29 S.W.3d 324, 327 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Officer Cannon testified to the following matters observed or discovered during the initial stop as justification for the continued detention, set out below in approximately the order of importance the officer attached to the information: (1) although Wren was told that he was only being given a warning ticket, his apparent nervousness steadily increased during the traffic stop, (2) when inquiry was made about his criminal history, Wren admitted to an arrest for murder, but failed to mention a conviction for drug-related offenses, (3) the rental car being piloted by Wren had been rented by a third person who was not present, (4) although Wren indicated that his intention was to go to Dallas for the funeral of an uncle, he was ambiguous about and seemed uncertain regarding important information which would usually be known to attendees of such an event, such as the

7

date of death of the uncle and the dates or times of the funeral or the wake, (5) Wren was traveling over 500 miles with his large dog in tow, (6) the ubiquitous statement that the stated travel plans were from and to a "known drug destination" (Illinois to Dallas) and was driving on I-30 (stated to be a well-known drug corridor), both of which the officer suggested were reasons to be suspicious, and (7) rather all-inclusively, "the totality of the circumstances."

This Court has repeatedly stated that destinations and roadways are not strong support for suspicion of drug-related activity, indeed at this point in time almost any destination or roadway could be so described.[5] It is difficult for anyone to equate the presence of a dog in a car with evidence of involvement in illicit activity. We also find the imprecise nature of the explanation about a funeral "Saturday or Sunday" (as opposed to a time and place certain) to be unpersuasive. The rationale of the "totality of the circumstances" is so nebulous and so imprecise as to add nothing to the analysis.

The other matters are, however, of some interest. The fact that the rental car was rented by a third person, was overdue, and was headed in the wrong direction, while not dispositive, is curious. Wren's failure to mention his 2007 drug conviction is also some indicia of an intention to conceal a role he may have been playing in the circumstance (although it is possible that such a reaction could be due to a bad case of forgetfulness due to sitting in the front seat of a police squad car). Similarly, the fact that his level of nervousness increased steadily despite being told that he would receive only a warning ticket is an indicator that something was amiss.

---

[5]We also note that at one point in the not-too-distant past, the possession of a cellular telephone was touted as a suspicious factor to provide reasonable cause and justify a search. *State v. Guzman*, 942 S.W.2d 41, 42 (Tex. App.—Corpus Christi 1997), *rev'd by* 959 S.W.2d 631 (Tex. Crim. App. 1998). Similarly, so were pagers. *Torres v. State*, 818 S.W.2d 141, 146 (Tex. App.—Waco 1991), *rev'd on other grounds*, 825 S.W.2d 124 (Tex. Crim. App. 1992). Things change.

The evidence supporting the requisite reasonable suspicion is marginal, but we find it is sufficient to justify a continued detention pending arrival of a drug dog—for a period of time that apparently was not long or some mention assuredly would have been made of its excessiveness. There is testimony that when the drug dog did arrive, it conducted an open air sniff and alerted on a seam between the front and rear doors of the vehicle's passenger compartment. That, along with the evidence of the dog's training and certifications, provides sufficient cause for the search of the vehicle, and there is no evidence to the contrary. *Florida v. Harris*, No. 11-817, 133 S.Ct. 1050 (2013); *Rodriguez v. State*, 106 S.W.3d 224, 229 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

**Is the evidence sufficient to support forfeiture?**

Under civil preponderance-of-the-evidence standards, evidence is legally insufficient only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). The final test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Wilson*, 168 S.W.3d at 827. In making this determination, we credit favorable evidence if a reasonable fact-finder could credit it, and disregard contrary evidence unless a reasonable fact-finder could not disregard it. *Id.* This is more than a mere question of whether evidence exists that has some remote relation to the

9

verdict. *$43,774.00 U.S. Currency v. State*, 266 S.W.3d 178, 183 (Tex. App.—Texarkana 2008, pet. denied). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Wilson*, 168 S.W.3d at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. Although we consider the evidence in a light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id*. at 822.

This Court has had opportunity before to address this same sort of situation (which, coincidentally, was an appeal from this same county). In *$130,510.00 in U.S. Lawful Currency v. State*, 266 S.W.3d 169, 175 (Tex. App.—Texarkana 2008, pet. denied), we addressed the sufficiency of the evidence, finding it legally sufficient but factually insufficient to support the verdict. That case bears a number of similarities to the one before us. In that case,

> the State found a group of individuals in an almost-new pickup truck with $130,510.00 in cash shrink-wrapped and tucked beneath the carpet in the back of the truck's cab. A drug dog alerted on the outside of the truck, on the driver and passenger sides, and on the bottom of a trash can in the DPS station house. Beneath the trash can were wrappings taken from the money. Troopers described the wrappings as being shrinkwrap and tape previously containing the rubber-banded stacks of cash. Both Manuel and Heron have records for possession of large quantities of marihuana. When asked by officers on the scene if the truck contained any large quantities of cash, Heron and Espinoza initially denied it.

*Id.*

The case now before us is weaker in some respects. Here, the officers did not attempt to find out if the drug dog would alert on the money itself, but restricted the dog-sniff search generally to the automobile. Thus, all we have is evidence that a drug dog alerted to the presence

10

of drugs in a car in which no drugs were found. The money was not shrinkwrapped; it was simply in a shopping bag stuffed in a cardboard box. Thus, some of the indicia upon which one could rely in other cases simply do not exist here.

Lance Cline, another officer with the Texas Department of Public Safety, was allowed to testify as an expert witness in matters involving the world of illegal drug trafficking. Much of his testimony concerned his extrapolation of the volume of drugs or marihuana this money would buy (purportedly to show that if the money were converted into illicit drugs, the quantity involved would equate to felony offenses). He also testified that whenever he had seen money banded by rubber bands in thousand dollar increments in multiple denominations, it had always been admitted that drug money was involved. Finally, he stated that he simply did not know any individuals who carried that much money in cash.

Going outside the purview of generalities, Cline provided substantial testimony about his research into Wren's background and history. Cline testified that he

> spoke with DEA Agent -- his last name is Brague -- in the Illinois DEA, and they said that they had information that they have human sources on the ground that Mr. Wren had purchased or sold cocaine to two suspects that were involved in an investigation federally there in Illinois.
> I confronted with Mr. Wren that information. I asked him about it, and he never requested an attorney, so I just continued to talk to him, said, "Well, maybe we can help you out. Maybe you can do these things for yourself," and his response to me was that -- and I presented him with a situation, like a hypothetical, and I said, "Let's say that I know this guy brought this money in, and I think he did this, X and X, with this money," and he fired back in a hypothetical, and he said, "Well, what if this guy was scared to death of the people that was responsible for some of this money and didn't want to -- and needed to go to jail today, but he might contact you later and cooperate with you in this investigation?"
> So I left it at that.

11

Cline also testified that he went to some of the databases (the Fusion Center) and found that Wren had not been employed since he had been in prison for murder—and Wren said he had some employment history in 2010, totaling about $900.00 (according to Illinois Work Force Commission records). Cline further testified that while incarcerated, Wren was confirmed to be a "Black Gangster Disciple" street gang member, a gang heavily involved in the distribution of narcotics.

During Cline's testimony, he indicated that Wren had first denied having any knowledge of the existence of the money in the trunk of the car he was driving (despite the fact that it was beside luggage he identified as his own).

Finally, Cline also testified that he had checked back with the Federal Drug Enforcement Agency and determined that Wren had been arrested with half a kilogram of cocaine on June 11, 2011, along with a female (who cooperated with authorities against Wren) who had been caught while smuggling five packages of cocaine. He said the family made a statement that she had made twelve to fifteen trips with Wren and carried five packages of cocaine and related that Wren had pled guilty to that charge in Illinois. Counsel objected to these statements as hearsay, but the prosecutor stated that the court was to consider that testimony only as a basis for the officer's expert opinion that the money was contraband based on all these factors. The trial court allowed the testimony. No complaint was raised on appeal to any of Cline's testimony.

In *$130,510.00*, we set out the facts in several roughly similar cases to provide context for our ultimate decision. As this is the same situation, we again review the way other courts have handled similar cases.

12

In *Deschenes v. State*, 253 S.W.3d 374 (Tex. App.—Amarillo 2008, pet. ref'd), evidence was presented that a drug dog alerted on bags in the trunk of a vehicle, bags which had held money wrapped and rubber-banded together. As in this case, the arresting officer thought Deschenes was acting nervously during the encounter, and he found a set of scales in the car. The appellate court found the evidence legally insufficient under the criminal burden of proof to support Deschenes' conviction for money laundering.[6]

On the other hand, a seizure was upheld where a large amount of cash was found that had been folded, rubber-banded, and put in plastic bags, with fabric softener sheets wrapped around those bundles. *State v. $104,000 in U.S. Currency*, No. 04-04-00608-CV, 2005 WL 2012341, at *2 (Tex. App.—San Antonio Aug. 24, 2005, no pet.) (mem. op., not designated for publication). That court, however, placed emphasis on the use of fabric softener sheets used in bundling the cash and on evidence that such sheets were used to foil drug-detection dogs. While there is no testimony in this record about the purpose of shrink-wrapping funds, a logical inference could equate shrink-wrapping (which describes vacuum-sealing something inside an airtight plastic covering) with the use of fabric softener sheets. Both logically could be seen as means of defeating detection of the drugs by dogs because fabric softener sheets would represent an attempt to mask the odor of drugs with another scent while placing the drugs in shrink-wrapping would reveal an attempt to seal the odor of drugs inside an airtight package. Neither situation exists in this case.

---

[6]A positive alert by a drug detection dog, standing alone, does not constitute evidence that money was used in connection with a drug deal. *$7,058.84 in U.S. Currency v. State*, 30 S.W.3d 580, 588 (Tex. App.—Texarkana 2000, no pet.); *$80,631.00 v. State*, 861 S.W.2d 10, 12 (Tex. App.—Houston [14th Dist.] 1993, writ denied); *see Deschenes*, 253 S.W.3d at 384 n.19.

In *$27,877.00 Current Money of U.S. v. State*, 331 S.W.3d 110 (Tex. App.—Fort Worth 2010, pet. denied), a similar assortment of evidence was relied on by the trial court. An individual (Benjamin Roberts) was identified by an informant as possessing marihuana. The informant also told the police where Roberts had hidden the money involved in the forfeiture action. A canine alerted on the residence, a black bag containing rolls of currency wrapped in hair ties was found, and Roberts provided a statement that the money did not belong to him and that he was unaware that it was under his bed. When the drug dog conducted an open-air sniff, it alerted on the currency. Evidence also showed that the individual had not worked since 2001 and that Roberts had pled guilty to possession of marihuana and had been sentenced to 180 days in jail. The Fort Worth court also recognized that the amount in controversy was a substantial amount of money to keep in cash, and for some unexplained reason thought it was "particularly notable" that it was found in "various denominations, tied with hair bands." *Id.* at 114.

In *$567.00 in U.S. Currency v. State*, 282 S.W.3d 244 (Tex. App.—Beaumont 2009, no pet.), the Beaumont court dealt with a man (Barnes) who had recently been released after thirteen years in prison and who police testified had been a drug dealer, though without proof that he had been recently engaged in drug trafficking. The court recognized that an "inordinately large sum of money" was not involved and that he had no apparent source of funds other than the alleged selling of drugs. *Id.* at 249. Barnes testified that he obtained money from another individual with whom he shared a bank account. The State neither refuted Barnes' testimony nor connected the other individual to drug trafficking. The court reasoned that the lack of any evidence about Barnes' activities at the time of his arrest was a fatal flaw and that the State's failure to somehow

14

place Barnes' acquisition of money in temporal proximity to his criminal activity resulted in the evidence being factually insufficient to support the judgment of forfeiture and remanded for a new trial.

For the purpose of this legal-sufficiency analysis, we credit the above evidence supporting the forfeiture and disregard contrary evidence. The evidence falls within the zone of reasonable disagreement. Therefore, we conclude the evidence is legally sufficient.

**Factual Sufficiency**

When considering a factual sufficiency challenge, we must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). After a court of appeals has taken into account and weighed all of the evidence, it is permitted to set aside a verdict on the basis of factual insufficiency only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam) (citing *Pool v. Ford Motor Co*., 715 S.W.2d 629, 635 (Tex. 1986)).

When circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well. *Wilson*, 168 S.W.3d at 814. The evidence before the trial court of the dog sniff of the car supports an inference that the car was at least at some point exposed to drugs (i.e., either that drugs had been in the car or a person who had carried or smoked drugs had been in the car). It might also support an inference that items within the car were at some time exposed to narcotics, but it does little more.

15

As we have previously acknowledged, simply possessing and hiding a quantity of cash is insufficient to prove the somewhat related crime of money laundering. *$130,510.00*, 266 S.W.3d at 177; *see Cuellar v. United States*, 553 U.S. 550, 564 (2008).

However, there was testimony by Cline that the drug trade ran on cash and that large quantities were necessary for it to function. Thus, possession of such a quantity of cash (although insufficient standing alone to show some unlawful connection) is some small evidence consistent with the requisite unlawful intent.

Cline's further unobjected-to testimony that Wren had not been very gainfully employed for a number of years before the traffic stop provides some support for the position that the money did not come into his possession as the result of diligent work and (since such funds are not regularly known to appear as by magic) raises some question regarding its source. Similarly, Cline's further testimony regarding Wren's membership in a gang noted for its drug dealings, together with a current drug-related conviction and his criminal background, creates a consistent scenario for the source of the money as connected to the drug trade. Wren's initial unwillingness to claim ownership of the money at the time of the search also suggests a guilty mind. Finally, even though the burden remains on the State, we note that Wren provided no other explanation for his possession of this rather large cache of cash. *Compare $130,510.00*, 266 S.W.3d at 173.

After considering all of the evidence and the reasonable inferences that could be raised from that evidence, we conclude that the evidence is also factually sufficient to support the verdict.

16

We affirm the judgment.


Bailey C. Moseley
Justice

Date Submitted:    March 4, 2013
Date Decided:     April 4, 2013